## BARBEE *v.* THE STATE.

No. 8792. August 10, 1932.

*J. J. Blount* and *H. E. Coates,* for plaintiff in error.

*George M. Napier, attorney-general, M. H. Boyer, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

Russell, C. J. J. F. Barbee was convicted of the offense of murder, and was sentenced to death by electrocution. He made a motion for a new trial, which was overruled, and in his bill of exceptions he assigns error upon that judgment. The motion for new trial contains the three general grounds, and by amendment three special grounds were added. We shall first consider the general

grounds, and thereafter critically examine the special grounds to see if in any one of them such error can be found as will require or authorize the grant of another trial. In the brief of learned counsel for plaintiff in error the three general grounds are not argued, and therefore under the well-settled rule they might be treated as abandoned. However, we consider it necessary to advert, in a general way, to the evidence, since a survey of the evidence is essential to a determination of the merits of the three special grounds, as each of these is dependent upon the nature of the proof which was under consideration by the jury in rendering their verdict. In the third special ground it is assigned as error that the court erred in not instructing the jury as to the law of involuntary manslaughter by giving them a proper charge which would have authorized the jury to find the defendant guilty of that offense. The first and second grounds each complain, in different language, that the court erred in admitting in evidence a telegram reading:

"To Mrs. Delmar Cannon    1931 Mar 2 PM 2-21

 "Street and No. 1534 Broadway. Place Macon Ga.

"Father seriously sick come at once. Mrs. J. F. Barbee."

In the first instance complaint is made that the evidence is insufficient to connect the accused with the sending of the telegram. In the second instance it is alleged that the court erred in admitting the telegram, because, it "not having been addressed to Delmar Cannon and not having been signed by movant, the same was inadmissible as being irrelevant and immaterial, and that its introduction would be harmful to movant."

The evidence which was before the jury, as testified by a number of witnesses, showed that immediately preceding and at the time of the homicide the killing was absolutely unjustified. A critical review of the evidence will not disclose any immediate provocation. The defendant in his statement declares that the deceased attacked, or was about to attack him with a large knife, and that he shot in self-defense, but the numerous eye-witnesses to the tragedy, without exception, disputed the statement of the accused—he stands alone, and it was within the province of the jury to believe the witnesses rather than the statement of the defendant. Counsel for plaintiff in error insist that the State's counsel made the following contentions: "1. That beginning as far back as 1927 the defendant had maintained with his daughter incestuous relationship, which he de-

sired to continue. 2. That after the marriage of his daughter to the deceased he lured him to Hawkinsville for the purpose of killing him; that through a false telegram he induced the deceased to come to Hawkinsville and killed him for the purpose of continuing his improper relations with his daughter." Of course, we have no means of determining from the record what were the contentions of State's counsel in his argument, other than in so far as we may surmise from certain portions of the evidence. But let it be conceded that the contentions of State's counsel were as stated in the brief of counsel for the plaintiff in error, still, as a matter of strict law, it was wholly unnecessary, under the testimony as to the factum of the homicide, for the State to have proved in this case any specific motive underlying the killing. All the testimony shows that the defendant, without any apparent provocation, and while engaged in conversation with the deceased, drew a pistol and began firing at the deceased; that the deceased had no weapon, and began to run as rapidly as possible, and while he was running the accused fired at him five times as he ran, until he dropped, mortally wounded, at the steps of his uncle's house whither he was fleeing for refuge. From this killing thus proved the law would imply malice, unless some evidence in the case rebutted that presumption. It is true that among other witnesses the State introduced the widow of the deceased (who is also the eldest daughter of the defendant), who testified, as stated by counsel in their brief, in substance, that her father had maintained, over her protest, incestuous relationship with her from time to time from her early girlhood. This incestuous relationship at one time resulted in the birth of a child, and evidence was adduced, without objection on the part of the accused, that a warrant was sworn out charging one Herbert Allen with the offense of seduction, which was later followed by the drawing of an indictment against Allen for the offense of seduction, upon which the defendant, J. F. Barbee, was prosecutor, and Maud Barbee (now Mrs. Maud Cannon) and two other named persons were entered as witnesses. Upon this indictment the grand jury made a return of "No bill." The widow of the deceased testified that she swore before the grand jury, as directed by her father, that Allen had had sexual intercourse with her, when as a matter of fact this was wholly untrue.

In the brief of counsel for plaintiff in error it is said that "It is

passing strange that from that date until the death of her husband, the deceased, she never told any body that her father was mistreating her; that none of the neighbors in the vicinity in which they lived ever took any steps about it; that when they moved from the place near Dublin where she contends her father begat the child, they took up their residence in the same county not far from where they were living, and the neighbors there never had anything to say about her improper relations with her father." Counsel then proceeds to argue that the witness swears now that her father was the father of her child, that the maxim *falsus in uno falsus in omnibus* should prevail, and her testimony should be disregarded. We can not know that the jury did not follow the maxim and totally disregard the testimony of Mrs. Cannon. Even if the jury had done this, there would still have been no evidence to rebut the direct testimony of a number of witnesses who saw the killing, and whose impeachment was not attempted and is not now suggested. The testimony of these witnesses demonstrates that the killing was not in self-defense; that the deceased had no weapon, and was making no effort to assault the defendant in any manner. So that to entirely disregard the testimony of the widow of the deceased would not affect the verdict, or prevent it from being demanded by the evidence. There is no evidence from any quarter which seems to palliate the killing or mitigate the offense, unless the jury had taken the view that the killing was the result of that sudden, violent impulse of passion supposed to be irresistible, and, in obedience to the instinct of mercy rather than the rules of law, had found the defendant guilty of voluntary manslaughter. Upon review of the charge of the court, we find that the judge correctly instructed the jury upon the law of voluntary manslaughter, thus giving the prisoner the benefit of all doubts and placing it within the power of the jury to find the accused guilty of the lesser offense.

■ There is no merit in the exception which complains that the court erred in failing to charge the jury upon the subject of involuntary manslaughter. Involuntary manslaughter, whether it be the killing of a human being in the commission of an unlawful act, or the killing of a human being in the commission of a lawful act without due caution and circumspection, is the killing of a human being when there is no intention to kill. Not only the evidence, but the defendant's statement, wholly contradicts the idea that the shooting

of the deceased in this case was unintentional. The testimony of the State was clear to the effect that each shot was aimed and fired at the deceased, and the defendant did not deny this, but said he was shooting to save his life, or to prevent the perpetration of a felony upon his person.

■ The third special ground of the motion for a new trial is as follows: "Movant says that the court erred in admitting in evidence over his counsel's objection, made when same was offered, the following telegram:

"To Mrs. Delmar Cannon,          ·   1931 Mar 2 P M 2-21
    "Street and No. 1534 Broadway.  Place Macon, Ga.
"Father seriously sick come at once.  Mrs. J. F. Barbee."

"By Mr. Boyer: I want to introduce this telegram which she says she received and same [came?] in response to:

'Received at Western Union Building, 455 Cherry St., Macon, Ga., 1931 Mar 2 PM 2 28.  QA264 6—Hawkinsville, Ga., 2 221P.

'Mrs. Delmar Cannon, Macon, Ga.

'Father seriously sick come at once.  Mrs. J. F. Barbee.'

"Mr. Boyer: I tender the original telegram.

"Mr. Coates: I object to the telegram, upon the ground that the signature of the sender has not been proven.  Mrs. J. F. Barbee purports to have sent it.  She says a boy brought it there that she did not know.

"The court: The telegram would not be admissible unless they connect it up with the defendant.

"Mr. Coates: I object to it on that further ground.

"The court: Well, it will not be admitted unless you connect it up.

"Mr. Boyer: If I do not connect it up, I will withdraw it."

Solicitor-general tendered in evidence, at the conclusion of the testimony of Joe Henderson, the original telegram referred to, as follows:

"To Mrs. Delmar Cannon,          1931 Mar 2 P M 2-21
    "Street and No. 1534 Broadway.  Place Macon, Ga.
"Father seriously sick come at once.  Mrs. J. F. Barbee."

The second special ground of the motion for a new trial is as follows: "The objection of counsel for movant was that the telegram not having been addressed to Delmar Cannon and not having been signed by movant, the same was inadmissible as being irrelevant and immaterial, and that its introduction in evidence would be harmful

to movant." It appears from the foregoing grounds, which relate to the same matter, that the court did not admit the telegram in evidence until the conclusion of the testimony of the witness, Joe Henderson. There was testimony that the defendant asked a witness named Grady Busbee to send a telegram to his son-in-law and his daughter to come at once, that he was seriously sick, and gave him a half-dollar with which to pay for it. This witness could neither read nor write. "Defendant told me to give this telegram to Levy Harrell; that is, he told me to give Levy Harrell that envelope, and I did so, and Levy got Joe Henderson to write the telegram." It appears from the evidence that the envelope which was given by the defendant to Busbee had only the name and address at Macon to which the telegram was to be sent; and that after Busbee asked Harrell to write the telegram on a blank which Busbee had brought from the telegraph office, Harrell asked a witness named Laidler to write the telegram; and he not being able to see, Joe Henderson finally wrote the telegram and signed it in the name of Mrs. J. F. Barbee, the wife of the defendant, instead of in the name of the defendant himself. Henderson testified: "When I went in, Levy [Harrell] and Mr. Laidler were back by the stove. I came in at the back from George Marchman's. They were talking and I stopped, and about that time Grady came in with the telegraph blanks. Levy asked Mr. Laidler, 'Come up here and write this telegram for him.' He said, 'All right.' They went up there to write it, and Mr. Laidler started it and did not have his glasses or something, and messed up a blank. I got up fixing to leave, and he asked me, 'Joe, you write this. You can make it shorter than I can. Make it as short as you can. Make it as cheap as possible.' I said, 'All right,' and took the pencil and wrote it. Nobody told me what to write. Grady told me Mr. Barbee was bad-off sick, and wanted to wire them he was bad-off sick, to come as quick as they could. Grady said Mr. Barbee wanted the telegram sent, I am certain of that. Grady said he had fifty cents to pay for the telegram, and I was trying to write it as short as possible, so the fifty cents would take care of it. I put J. F. Barbee's name to the telegram first, and Mr. Laidler said, 'Joe, that does not look right. They will not think he is very sick. I would not put it Mr. Barbee. That will not look like he is sick. They will think the man is not bad-off sick if you put his name to it,' so I put 'Mrs.' in front of

it to the telegram Grady sent." From this testimony it appears that Busbee was the agent of the defendant in connection with the sending of the telegram. Busbee was unable to read or write, and Joe Henderson prepared the telegram; but the information the defendant desired transmitted was conveyed by the efforts of his agent, Busbee, to the exact address, and to the person with whom he desired to communicate. For this reason, we think that neither of the objections contained in the first and second special grounds of the motion for a new trial is meritorious. The purpose of the defendant in sending the telegram, however innocent his motive may have been, was to secure the presence of his daughter at his bedside, and nothing more than this purpose was accomplished, although Henderson, on his own motion, inserted the word "Mrs." so as to make the call more urgent and imperative, if possible.

4. The court did not err in overruling the motion for a new trial. *Judgment affirmed. All the Justices concur.*