1. Both the corpus delicti and the perpetration of the alleged offense by the accused may be shown by circumstantial as well as direct evidence. In the instant case, the evidence was sufficient to establish both elements with respect to the crime of murder as charged in the indictment. Jester v. State, 193 Ga. 202 (17 S.E.2d 736).
2. It appearing from the evidence that the person alleged to have been killed was an infant child of the defendant's wife's sister, and that the defendant and his wife had a child of about the same age, evidence that the defendant after being arrested stated to the sheriff that he had killed his own child was not inadmissible upon the ground that the corpus delicti had not been proved, and that the statement of the defendant was not a confession of the crime charged in the indictment; it further appearing that the defendant in making such statement was referring to the transaction in which the child named in the indictment was killed, and that he merely mistook it for his own child at the time of the alleged killing.
(a) If the defendant intended to kill his own child, but, under a mistake as to identity, killed another and different child, his act would be measured by the same standard as if he had killed his own child. Glover v. State, 137 Ga. 82 (5) (72 S.E. 926); McLendon v. State, 172 Ga. 267 (4) (157 S.E. 475).
(b) Whether or not the defendant's statement to the sheriff could be treated as a plenary confession, where it appeared that the child the defendant stated he had killed was a different person from the child named in the indictment, yet it amounted at least to an incriminating statement, and could be proved as a circumstance. Sheffield v. State, 188 Ga. 1
(2), 5 (2 S.E.2d 657); Riley v. State, 1 Ga. App. 651
(57 S.E. 1031); Kinard v. State, 19 Ga. App. 624, 625 (3) (91 S.E. 941); Easterling v. State, 24 Ga. App. 424
(100 S.E. 727).
(c) Under the preceding rulings there was no merit in the first special ground of the motion for new trial, and on like principles special grounds 2 and 3 were also without merit.
3. Under the evidence, and the statement of the defendant referring to "my axe," the jury were authorized to find that the defendant had only one axe, and that the axe tendered in evidence was the "weapon" with which the deceased was killed. Accordingly, there was no merit in special ground 4.
4. While the defendant first stated to the officers that he had killed his own child, which was not the child that was killed, the evidence authorized a finding that, after later seeing the "dead baby" and learning that it was not his child, he stated that the "dead baby" was the one he had killed. The sheriff further testified: "He told me he killed it with an axe." Held, that under the evidence as to these several statements, regardless of others that may have been made, the judge was authorized to charge upon the subject of confessions. Nor was the charge, as given, otherwise erroneous as contended in special ground 5. Coney v. State, 90 Ga. 140
(3) (15 S.E. 746); Owens v. State, *Page 577 120 Ga. 296 (3) (48 S.E. 21); Jones v. State, 130 Ga. 274
(4) (60 S.E. 840); Allen v. State, 187 Ga. 178 (3), 181 (200 S.E. 109, 120 A.L.R. 495); Daniel v. State, 187 Ga. 411 (4), 413 (1 S.E.2d 6); Coates v. State, 192 Ga. 130 (15 S.E.2d 240).
5. Nor did the court err, as contended in ground 6, in failing to instruct the jury on involuntary manslaughter. The evidence for the State tended to show that the defendant intentionally killed a two-months-old baby by striking him with an axe. The defendant contended that he did not strike the child at all. "Involuntary manslaughter, whether it be the killing of a human being in the commission of an unlawful act, or the killing of a human being in the commission of a lawful act without due caution and circumspection, is the killing of a human being when there is no intention to kill." Barbee v. State, 175 Ga. 307 (2), 310 (165 S.E. 232). See also Jackson v. State, 91 Ga. 271 (3) (18 S.E. 298, 44 Am. St. R. 22); Moran v. State, 120 Ga. 846 (48 S.E. 324); Cullins v. State, 148 Ga. 17 (2) (95 S.E. 675); Carter v. State, 171 Ga. 406 (155 S.E. 670); Higgins
v. State, 172 Ga. 221 (3) (157 S.E. 643); Hilburn v. State, 57 Ga. App. 854 (197 S.E. 73). There was nothing in the case to show an involuntary killing.
(a) Under the ruling above made, no ruling is necessary as to whether the assignment of error is sufficiently definite; but see Williams v. State, 176 Ga. 372 (168 S.E. 5).
6. The evidence was sufficient to support the verdict, and there was no error in refusing a new trial.
Judgment affirmed. Jenkins, P. J., Duckworth and Wyatt, JJ., concur, Atkinson, J., dissents.
 No. 15156. JULY 6, 1945.
James Wright was convicted of the offense of murder in the alleged killing of Henry Clyde Harris on March 12, 1944, by "striking, beating, and wounding the said Henry Clyde Harris with a certain axe," and was sentenced to be electrocuted, the verdict having contained no recommendation. The defendant's motion for a new trial, containing the usual general grounds and six special grounds added by amendment, was overruled, and he excepted. The first three special grounds complained of admission of testimony over objection. Ground 4 complained that an axe was admitted over objection as not being sufficiently identified. Ground 5 assigned error on a charge to the jury on the subject of confessions, while ground 6 complained because the court failed to charge on involuntary manslaughter.
The evidence for the State tended to show the following facts and circumstances: The person alleged to have been killed was *Page 578 
the infant child of Daisy Bell Harris, a sister of the defendant's wife. The child was about two months old. The defendant and his wife, whose name was Oberzine, also had a child, a girl baby, about two and a half months old. The home of the defendant was only a short distance from that of Daisy Bell Harris, and the alleged offense was committed at the home of the latter. If the defendant did kill the deceased, he did so under the mistaken belief that he was killing his own child, and not Henry Clyde Harris, the child of his sister-in-law.
Daisy Bell Harris testified for the State, in part, as follows: "I knew Henry Clyde Harris in his lifetime. . . He was killed. He was my baby, two months old. He was killed at my home in the daytime. He was killed by James Wright. The first time I saw James Wright on the day Henry Clyde Harris was killed was before dinner. The baby was killed about two o'clock in the afternoon. I was at home, and James Wright come and asked me where was his wife, and I said, `I don't know,' and he said I did know. He said I was telling him a lie. I was at home standing in the door at the time. He did not have any weapon or anything with him the first time he came there. On the first occasion, he left and went home. He did not stay so very long. When he came back the second time, he had an axe. I was standing by the fireplace, and when he come up I came to the door. My door was not latched then. I latched the door the last time he come. He come into the house. He cut the door with the axe. I was in the house at the time, and when he started cutting on the door, I run out. Nobody was in the house besides me and the baby. Henry Clyde Harris, the baby, was on the bed. I ran out of the house across the field, and went out to the road. I did not take the baby with me, I left the baby in the bed. I met Ma and came back with her and saw he was lying on the floor. My mother's name is Corrine Johnson. I did not see my baby on the floor, she said he was. The next time I saw my baby he was on the bed, dead. James Wright had gone home. When the sheriff and them got there, they brought James Wright to my house that afternoon. James Wright said he was intending to kill his own baby. His baby was a girl baby and he intended to kill his baby. His baby was two months and two weeks old. My baby was two months old, about the same age. My baby was *Page 579 
a boy baby and his baby was a girl baby. His baby had been staying there at my house. James Wright's wife was my sister. All that I have testified about happened in Terrell County in March of this year. . . I am not married to my baby's pa. I am 18 years of age. . . I live with my mother out east of town on Mr. Morris Fleming's farm. . . James Wright lives just across the field from where we live. I can stand in my door and call him from his house. . . Oberzine, my sister and James' wife, had been down to my house on Saturday. She did not come down there Sunday. James Wright came to my house Sunday before dinner. . . He didn't have the axe at that time. . . When he came back the second time, he came back with the axe. He said, `I asked you about my wife,' and he said, `You do know where she is,' and I said, `I don't know,' and he drawed back on me. . . When he come back the third time, I saw him before he got to the house. I jumped up and bolted the door. Then I got some potash water in a pan and threw it on him. When he come there, he stepped up to the door and asked me to let him in, and I say, `I am not going to do it, you go back home.' I threw the potash water in his face when he started up the doorsteps. I opened the door, threw the water on him, and then shut the door back and stayed there till he come up on the porch and hit the door with the axe and busted a slit in it, then I ran out the back door and left. So far as I know James never did get in that house. When I ran out the third time, I ran out across the field and came to the big road. Then I got with my mother and came on back home. My mother was gone to lodge meeting. Aunt Maria was standing on our porch when I left home. I ran out the back door, went out to the public road, and went to meet my mother. So far as I know, James never got in the house. My baby was in the bed, in the middle of a double bed. My baby was two months old and had been in that bed a long time, been on it ever since I was cooking dinner. He was on that bed asleep the first time James came down there. He was on there the second time he come. He was on there the third time he come. He had not been taken off the bed at all. . . The baby was lying straight up and down lengthwise, covered up with his blanket over him. . . My baby had his clothes on, his dress and underskirt. The next time I saw the baby he was on the bed. He *Page 580 
was not in the same position he was when I left that house. He was dead the next time I saw him. . . I saw the baby late that evening. He was still on the bed." Q. "Did you see any signs on the baby of any bruises or cut places?" A. "On one side of his head. The skin was not broken. It was a kinder large size place right along there. . . I do not know how come it there. There was no other place, except one little bruised place on the side of the neck that I saw on the baby. . . At no time when James came to my house did he say anything about his baby or anybody else's baby. He was hunting Oberzine, his wife. . . There were four children out there in the yard. They were there during the whole time. Aunt Maria was on the porch the third time James come down there, on the porch at my house where my baby was on the bed on the inside. I was on the inside of the house and saw James coming, and I bolted the door because James had previously been down there and drawed the axe on me and told me I was lying. I don't know what Aunt Maria was doing on the front porch. She was not there when James come the second time. When he came the third time she was out there and she was the one that said he was coming. . . She stayed on the outside on the porch and I was on the inside. James did not say anything to Aunt Maria when he came on the porch. When James cut the slat out of the door, and I left there, I left her on the porch. . . My baby was not in the same position when I finally decided to go back in the house it was when I left. I left him lying middle ways of the bed, when I got back he was lying on the edge."
Maria Solomon testified for the State, in part as follows: "I knew Henry Clyde Harris in his lifetime. I know Daisy Bell Harris, and I knew her little boy, the one that got killed, named Henry, because I named him. . . Henry is dead. He was killed. I do not know who killed him. I was there at the time he was killed. I was standing on the porch, James Wright come up, and I stayed there on the porch till he got the door cut open. He says, `Daisy Bell, how come you tell me that God damn lie?' He run up to the door and says, `God damn you,' and commenced cutting the door open. I hopped off the porch and went home and shut the door, and in a few minutes he came through my yard and says: `You throwed the potash water on me and run. I done *Page 581 
killed your God damn old baby, and you can do anything you want with me.' He said that in my yard and I heard him. I was sitting in my house at the time. When Daisy Bell and her mother come, I went in the house behind her. When I went in the house, the baby was lying on the floor with blood running out of his nose. That is all I know about it. . . I swore in the justice court that James never said a word to me. He didn't say a word to me. I said, when he came through the yard, he said he had done killed the damn baby. He didn't say it to me. When I got in the house he didn't see me. I was shut up in the house. He didn't say anything to me. I just overheard him say that. I was in the house shut up. . . I knew it the day the committal trial was held, and I was swearing that day. I swore that day that I did not hear James say anything. I am swearing to-day that I did hear him say something. What I say now is the truth. Nobody told me to swear that. I told the truth as far as I know. I am the aunt. I am the star witness for the State in this case. I don't know that I appeared on the scene the third time that James went to the house. I saw James there three times. I am the one that got shut up in the house and heard James say, walking up the road, that he killed the damn baby. . . I didn't see the potash water. That door was shut then. That is when he cut it open. That was when I got off the porch and left. He got the door cut open and got in the house. I went to my house. I got in my house and sat down. I waited till James got the door cut open and went in Daisy Bell's house before I left. I do not know what happened then. I do not know where Daisy Bell was. . . I was down there when Mr. McGraw and Mr. Turner had James under arrest and brought him to the house. I heard him ask them if it was a girl baby or a boy baby, and they told him it was a boy baby. I did not touch the baby when I got back over there. I was not the one that picked him up off the floor. I didn't think about what I heard James say right then, I mean. I had been over there on the porch, and had heard James cut the door open with the axe, and I knew he had done been there two or three times, he was cursing at Daisy Bell about telling him the God damn lie, broke the door open in my presence, me standing on the porch, and when he got in the house, I jumped off the porch and went to my house. My house is between that house and where James lived. *Page 582 
James does not live very far from me. He went right through my yard going home, and when he got in the yard he says he had killed the God damn baby, and I didn't think enough of it to say anything about it until somebody went down there and discovered it. I did not think enough of that transaction to get out and say a thing to anybody. I was sick and weak. I was going, but I was too sick and weak."
J. A. Turner testified for the State, in part: "I am the sheriff of Terrell County. I know James Wright, the defendant in this case. . . I recall in March of this year when it was reported that James Wright had killed a little negro by the name of Henry Clyde Harris. I went out there with Mr. McGraw, the deputy sheriff of Terrell County. . . We then went to Mr. Morris Fleming's farm, and when we got there we found the baby dead. James Wright was not there where we found the baby dead; he was at home at his house. . . We went to his house and found James sitting on a log at the woodpile, with an axe between his legs. That is the axe. I told him what I wanted with him when I got there. When I first questioned him about killing this baby, he said he didn't know anything about it. He was pretty drunk. . . I kept talking to him, and he says, `Captain, I am going to tell you the truth.' I did not threaten him in any way to make a statement I did not offer him any inducement or hope of reward. The statement. was freely and voluntarily made to me by this defendant. He said, I am not going to tell any lie about it, I did kill him.' I said, `Why?' He said his wife took the baby and went off with it and he got mad with her and could not find her and he killed the baby, and also admitted chopping the door open with the axe. . . He admitted to me that he killed the child with the axe. . . He denied it when I first asked him. I says, `James, what in the world did you want to kill the baby for?' He says, `Captain, I didn't kill it.' He was then under arrest and in my car. I had got him and had got the axe. I did not use a word of profane language to him. . . I did not threaten him in any way. . . When I drove up to his house, he was at the woodpile with the axe. When I called to him, he immediately came to the car. I drove up as close as from here to the wall to him. He did not bring the axe the first time I called him. I went and got the axe. I did not want him to bring the axe. He did not show any resistance at all. He did not try *Page 583 
to run or get away. I do not know as a matter of fact that the baby was killed with an axe. I saw the baby, and was there when it was examined. I did not see any fracture or abrasion, broken skin at all. . . I looked at it, the skin was not even broken, I didn't see any blood, except it bled at the nose. A blue spot about here. It was a very small child. The spot I saw was just on the side of the neck, I would not say which side. I would not say what I saw was the result of a blow struck with an axe. . . I asked him why he killed the baby, and he said he killed his baby. He said one of the babies was a boy and one was a girl and the girl was his baby. What he told me was that he had killed his own baby, that is exactly what he said. But he had not done that. . . After we got to the house, after looking at it, he still thought it was his baby. That was when he corrected himself. He thought it was his baby. I didn't know it was not his baby, until we got to this house. I don't know whether he was so drunk he didn't know what he was talking about or not. . . He confessed to me he killed the baby, and it turned out he did not kill his baby. . . He saw the dead baby, and he said the dead baby was the one he killed and he thought it was his baby. . . He told me he killed it with an axe, and I did not see anything to indicate that it was killed with an axe. The axe was half a mile from there."
B. B. Garden testified for the State, in part as follows: "I am coroner of Terrell County. I know the defendant, James Wright. That is he sitting there. I remember going out to where it was said that James Wright killed a baby here in March of this year. I saw the baby, Henry Clyde Harris. I made an examination of the baby. He had a bruised place on the shoulder, on its shoulder and neck along here about the width of two fingers and about 3-1/2 inches long. The shoulder was crushed and the neck broken. That could have been made with an axe. It looked like it was made with the back of an axe to me. I was not there when they brought the negro, James Wright, there. He told me on Monday afternoon that he killed it, but thought he was killing his own baby. . . It was in the jail that he told me that he killed it and thought he was killing his own baby. I passed by the jail and stopped and talked to him. It was necessary for me to swear out the warrant in the case. I didn't stop to see him, I just saw him standing at *Page 584 
the window looking out. I was there on the sidewalk by the jail on Stonewall Street. I don't know what part of the jail negroes stay in. I didn't go in the jail. I told you he was standing at a window, and I was at the fence, outside of the fence. He was in the jail and he hollered he wanted to tell me something. He didn't holler at me to stop he wanted to tell me something. I held the inquest. . . I could not repeat the names of the persons on the jury. I had the inquest on Sunday afternoon, the 12th of March. Mr. McGraw and Mr. Turner were there. If they had looked, they could have seen what I saw. I didn't call it to anybody's attention. It has not been necessary to tell it to anybody till now. . . Richard Frazier was on the coroner's jury. I called it to their attention. I said, `This child's neck is broke.' C. P. Stevens was on the coroner's jury. G. B. Thompson was on there. I think George Lord was on there. We had the inquest later in the afternoon. The baby had not been dressed. He was not broke all to pieces. Its shoulder was crushed and neck broke, the skin was not broke. The skin was not broken. The neck was broken and the shoulder crushed in The skin was not broken. The baby was in the bed when I first saw it. He had been picked up off the floor. There was a spot of blood on the floor where blood oozed out of his nose. . . The place on the baby's shoulder was about the size of the back of an axe. Only one lick. I do not know who picked the baby up. It was on the floor when I picked it up. The spot of blood on the floor was about three or feet from the side of the bed. I mean only about three feet from the bed from that master lick that crushed in the shoulder and neck and didn't break the skin. The man would had to have been on the side of the bed where the child was knocked off to have hit that lick. That bed was a common standard bed. A man could stand on the floor on the side the baby was and hit a baby lying lengthwise and knock him on the floor about three feet, could have knocked it off the bed standing over it. The bed had a mattress on it. . . I did not say that James hollered out the window and said he killed him. He stopped me, and I asked him what he meant by killing that baby, and he said he thought he was killing his own baby."
The State tendered and the court admitted in evidence the axe identified as being the one James Wright had at the time he was arrested. The State then rested its case. *Page 585 
The defendant made the following statement to the jury: "When I went down there that Sunday, I went down there to go back of the house and cut some splinters, so I taken my axe with me, it is not far down there. I got down there and knocked on the door. I heard somebody talking on the inside, but they would not open the door. I knocked again, the door opened, and she throwed potash water in my face. I did not go in the house at all. I went to see about my wife; she had not come home. I didn't even go in the house. . . As far as that man said he come by the jail house, I didn't tell nobody, so far as I know, I killed the baby. I have children and I love them and I never had that thought in my mind. I love my children. I don't know about killing the baby. I don't know nothing about me telling them I killed my baby. I was full of whisky, I was drunk. I am telling the truth, I don't know nothing about me telling nobody I killed him. The fact about it is, I didn't do it; I didn't kill nobody at all. They accused me of something I didn't do. How the baby got hurt, I do not know. I could not hit no baby, and I didn't go in the house. I knocked on the door and she throwed potash water in my face and I turned and went home. I was there not long before they come and got me. No, sir, I never have and never will the last day I live have killing a baby in my mind. I got three children and God knows I love them and will do all in the world I can for them. As far as Aunt Maria, she was not there, she was at home somewhere. I have not went back nowhere; she have not heard me say nothing, because I have not said nothing. They accuse me of that and I didn't even go in the house. I have not seen the baby. Somebody told me it was lying on the floor. I have not been in the house. When I left there, I did not go back there. . . I did knock the door open, but I did not go in the house. I never hit anybody. . . I had a lot of trouble down there with my wife. I had to work and gather the crop by myself. She was after men, and I could not do with her work. I went on trying to keep the children." The defendant rested his case.
W. W. McGraw testified for the State, in part: "My name is W. W. McGraw, the deputy sheriff of Terrell County. . . I examined the door of that house. On the left-hand side of the door, it had been cut open. Where you latch the door, one or *Page 586 
two planks had been split. It was cut to where you could go in the house. I saw James Wright on that occasion, we arrested him that day. . . We carried him over to the house where the dead baby was, and he said he thought it was his baby. I said, `Was your baby a boy or a girl,' and he said, `A girl.' I said, `This is a boy baby.' He said, `My sister-in-law had a boy baby.' He said that was the baby he killed. . . I don't remember about Mr. Garden examining the body. He was doing something to the baby. I was there during the coroner's inquest. I saw the little bruise on the side of the child's neck. There was no skin broken. I don't know whether the baby's neck was broke or not."
In the first special ground of the motion for new trial, it was contended that the court erred in not excluding the following testimony of sheriff J. A. Turner: "We went to his house and found James sitting on a log at the woodpile, with an axe between his legs. This is the axe. When I first questioned him about killing this baby, he said he didn't know anything about it. I kept talking to him and he says, `Captain, I am going to tell you the truth, I am not going to tell any lie about it, I did kill him.' I said, `Why?' He said, his wife took the baby and went off with it, and he got mad with her and could not find her and he killed the baby. I do not know as a matter of fact that the baby was killed with an axe. I saw the baby; was there when it was examined. I did not see any fracture or abrasion, broken skin at all. Some of the jurors examined it. I looked at it, the skin was not even broken. I did not see any blood, except it bled at the nose; a blue spot about here. The spot I saw was just on the side of the neck. I would not say what I saw was the result of a blow struck with an axe. I asked him why he killed the baby, and he said he killed his baby. What he told me was that he had killed his own baby; that is exactly what he said, but he had not done that. He confessed to me he killed his baby, and it turned out he did not kill his baby." At the conclusion of this testimony, the defendant moved to exclude it on the grounds that the corpus delicti of the crime charged in the indictment had not been proved, and that the testimony quoted was not evidence of a confession of the crime charged in such indictment.
In special ground 2, it was contended that the court erred in not excluding the following testimony of the coroner, B. B. *Page 587 
Garden: "I remember going out to where it was said that James Wright killed a baby here in March of this year. I saw the baby, Henry Clyde Harris. I was not there when they brought this negro, James Wright, there. He told me on Monday afternoon that he killed it, but thought he killed his own baby. It was in the jail that he told me that he killed it, but thought he was killing his own baby. I passed by the jail and stopped and talked to him. He stopped me, and I asked him what he meant by killing that baby, and he said he thought he was killing his own baby." The grounds of the motion to exclude the testimony of this witness were the same as those urged in the motion to exclude the testimony of sheriff Turner.
In special ground 3, it was contended that the court erred for similar reasons in not excluding the following testimony of W. W. McGraw, deputy sheriff: "I know the defendant in this case, James Wright. I had occasion in March to go out there where there was a negro baby killed. I saw James Wright on that occasion; we arrested him that day. He made a statement to me. When we first put him in the car, he said he didn't know anything about it. Mr. Turner and I both questioned him. Then he said, `Captain, I am going to tell you the truth, I did kill the baby.' We carried him over to the house where the dead baby was, and he said he thought it was his baby. That is what he told us, said he killed the baby, said he killed his baby. Up the road when he said he was going to tell the truth, he thought he was talking about killing his own baby. I saw the little bruise on the side of the child's neck. There was no skin broken."
In special ground 4, it was contended that the court erred in admitting the axe, identified by the witness, J. A. Turner, as being the axe James Wright, the movant, had at the time he was arrested. The movant objected to this testimony, on the grounds then and there urged that the axe tendered in evidence had not been identified as the weapon which produced the death of Henry Clyde Harris.
In special ground 5, the movant complained of the following excerpt from the charge of the court: "I charge you, gentlemen, that a confession means an admission on the part of a person, who is charged with a crime, admitting his guilt thereof. All admissions should be scanned with care, and confessions of guilt should *Page 588 
be received with great caution. Before a confession would be admissible, it must have been made voluntarily, without the slightest hope of benefit, or the remotest fear of injury." It was contended that this charge was erroneous for the following reasons: No evidence to authorize the same; there being, as the movant contends, no legal evidence of any confession by the movant of the crime charged in the indictment; the charge amounted to an expression of opinion that such a confession had been made by the defendant, when, as movant contends, if the evidence showed a confession, it was a confession not of the crime charged in the indictment but one for which the movant was not on trial; that the portion of the charge, "Before a confession would be admissible, it must have been made voluntarily, without the slightest hope of benefit, or the remotest fear of injury," was confusing and prejudicial, for the reason that all evidence had already been admitted, and amounted to an expression of opinion by the court that such confession was freely and voluntarily made, whereas, as the movant contends, this was a question for the exclusive determination of the jury.
In special ground 6, it was contended that the movant should have a new trial because the court "failed to charge the jury the law of involuntary manslaughter as embodied in Code section 26-1009 of the Criminal Code of Georgia." In connection with this ground, the movant set forth certain portions of the testimony of J. A. Turner, sheriff, and of W. W. McGraw, deputy sheriff.