## 34170. JENKINS *v.* THE STATE.

DECIDED SEPTEMBER 23, 1952.

*J. D. Godfrey, Casey Thigpen,* for plaintiff in error.

*W. H. Lanier, Solicitor-General, E. T. Averett,* contra.

CARLISLE, J. The defendant, Talmadge Jenkins, was indicted for the murder of Charles Hannah. Upon his trial he was convicted of voluntary manslaughter and sentenced to serve from fifteen to twenty years in the penitentiary. His motion for a new trial, based upon the usual general grounds and six special grounds, was overruled and he excepted.

The indictment charged that the defendant committed the murder by hitting and beating Charles Hannah with "a certain pine board." From the evidence adduced upon the trial it appears that the defendant, in one automobile, followed by a

brother or brothers, in a second automobile, was driving along a road in Washington County, following a tractor driven by James Braswell, an employee of Mrs. Layton. Just as Braswell turned the tractor into the entrance of the Layton property, the automobile driven by the defendant and the automobile driven by one of the defendant's brothers collided. Without stopping, Braswell drove the tractor on to the shed where it was kept and was storing it for the night when he was accosted by the defendant and his brothers who accused Braswell of having caused their automobiles to collide. The defendant's two brothers did most of the talking to Braswell, who suggested that they take the matter up with his "boss lady," Mrs. Layton. As they proceeded to Mrs. Layton's house, a short distance from the tractor shed, one of the defendant's brothers, not the defendant, struck at Braswell with a knife, as Braswell steadfastly denied any responsibility for the damage to the automobiles. Upon reaching Mrs. Layton's house, the defendant, his brothers, and Braswell, all colored men, entered Mrs. Layton's kitchen, where the defendant's brothers were still adamant in their contention that Braswell had caused the damage to their automobile and that he should be made to pay for it. Mrs. Layton ordered the defendant and his brothers to leave her house and instructed them to get "the law" to settle the matter. The defendant, who had not said a "cross word" to Braswell asked him to come out to the automobiles and inspect the damage. At this point Charles Hannah, an aged colored employee of Mrs. Layton, arrived and began to scold the defendant and his brothers for accusing Braswell of causing the damage, as he, Hannah, had seen the entire occurrence and Braswell was not to blame. Hannah also scolded the defendant and his brothers for disturbing Mrs. Layton, a white lady who had been very ill. As the defendant, Braswell, and Hannah, stopped to inspect the damage which had been done to the grill work of one of the automobiles, the two brothers of the defendant drove the second automobile away, leaving the defendant, Braswell, and Hannah together at the other automobile. As Braswell stooped to inspect the automobile, Hannah and the defendant continued to talk to each other, but Braswell, the only other person present, could not hear what was being said, and just at that point Mrs. Layton

called to Braswell to come to the house. As Braswell proceeded to the house, he looked back, saw the defendant with a scantling, or pine board, in his hand with his arm drawn back and Hannah had one of his arms raised in the air, and called to Mrs. Layton that "they are fixing to kill Uncle Charlie [Hannah]." Braswell did not see the defendant strike Hannah, nor hear the blow, but saw Hannah fall and saw the defendant throw the board down and depart. On cross-examination, Braswell also testified that Hannah said, just prior to the blow delivered by the defendant, "Don't you do it." Braswell also testified that Hannah fell to the ground and never spoke again, that he, Braswell, found an open knife and Hannah's glasses lying on the ground near Hannah, who was bleeding from the nose and from an injury on the side of his head. Another witness, Freddie Daniel, who arrived shortly after the altercation between the defendant and Hannah, testified that he met the defendant leaving the scene, and that, though he did not understand the significance of the remark, the defendant had said to him, "I got your man." This witness also testified that an open knife was found on the ground near Hannah and that he knew it to be Hannah's knife. The sheriff of the county testified that when he arrived at the scene Hannah was still lying on the ground unconscious, and that he had been hit on the head with some kind of instrument; that he found at the scene a pine board which had been freshly broken in two; that the board had been about three feet ten inches in length, about three and one-half inches wide, about three-quarters of an inch thick; that the board contained more heart, or fat lightwood than the usual pine board; that he did not know the weight of the board, but that the board was an instrument with which one could kill another by hitting him on the head, and that the "sign" or wound on Hannah's head could have been made by the board; that he took Hannah to the hospital in an ambulance, and that Hannah died there without ever regaining consciousness.

The defendant in his statement to the jury outlined the events leading up to the time of Hannah's death somewhat as Braswell had done and stated: "I would have been gone but I had to pull my fender loose where it had done tore it up, I pulled it loose and I says well I reckon I better go, I will see you; just

as I went to get in the car, well this fellow, he run up and he says don't you get in that car, don't get in that car, and he struck at me with his knife and cut my coat right here, and I backed up into a corner and he was still coming on me with that knife and I got this piece of board and hit him; I had to do it to save my own life. He had me in a jam."

1. Under the general grounds, and special grounds 1 and 2, of his motion for a new trial, the defendant contends that the evidence did not authorize his conviction of voluntary manslaughter; that the court erred in charging on that subject and also erred in failing to instruct the jury on the two grades of involuntary manslaughter. As these assignments of error are so intricately intertwined and consist in each case of the question of the sufficiency of evidence to authorize the conviction of, and the charges on, manslaughter, they will be considered here together.

In this State manslaughter is held to be either voluntary or involuntary and these two classes are defined respectively as follows: "In all cases of voluntary manslaughter, there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied. . . The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should have been an interval between the assault or provocation given and the homicide, of which the jury in all cases shall be the judges, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and be punished as murder." Code, § 26-1007. "Involuntary manslaughter shall consist in the killing of a human being without any intention to do so, but in the commission of an unlawful act, or a lawful act, which probably might produce such a consequence, in an unlawful manner: Provided, that where such involuntary killing shall happen in the commission of an unlawful act which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a riotous intent, or of a crime punishable by death or confinement in the penitentiary, the

offense shall be deemed and adjudged to be murder." Code, § 26-1009.

The evidence shows that the defendant and Hannah were strangers. There had been no prior ill feeling or animosity between them. The defendant, during the course of the discussions concerning the damage to his automobile, had appeared composed and had not demonstrated any anger or engaged in any opprobrious words with Braswell, nor is there any evidence of his having displayed any anger towards the deceased. He says in his statement that the deceased struck at him with a knife and cut his coat as he was preparing to enter his automobile to depart. There was evidence that a knife belonging to the deceased was found open at the scene near the deceased. The defendant also stated that after striking at him with the knife the deceased continued to "come on" him with the knife, that he, the defendant, was cornered, and that he grabbed up the board and hit the deceased, which was necessary to save his own life. Taking the evidence as a whole, we think the law of manslaughter, both voluntary and involuntary, was applicable. If the jury believed that the defendant struck the deceased the blow in self-defense against the deceased who was at the time really or apparently endeavoring by violence to commit a felony on his person, and the circumstances were sufficient to excite the fears of a reasonable man that such was the purpose of the deceased, the defendant would, of course, have been justified. If he struck the deceased, not for the purpose of defending himself from what he honestly believed to be a felonious assault, but from a sudden heat of passion engendered by the deceased's striking him with the knife and continuing to "come on" him with the knife, he would be guilty of voluntary manslaughter. If he struck the blow suddenly with the board, which he had hastily procured as the deceased advanced upon him with the knife, with no intention to kill and only to prevent injury to himself, less than a felony, he would be guilty of involuntary manslaughter in the commission of a lawful act, without due caution and circumspection. There was evidence from which the jury could have drawn either one of the conclusions indicated above, and the court's failure to charge the applicable law of involuntary manslaughter requires the grant of a new trial.

*Warnack* v. *State*, 3 *Ga. App.* 590 (60 S. E. 288); *Dorsey* v. *State*, 126 *Ga.* 633 (55 S. E. 479); *Greenway* v. *State*, 59 *Ga. App.* 461 (1 S. E. 2d, 217). The deadly character and manner in which a weapon is used is not conclusive of the question of intent to kill, but is only illustrative of such intent, nothing more appearing, and where from any circumstance there is doubt of the accused's intention to kill, the trial court must not exclude the question of such intent from the consideration of the jury by a failure to charge the lesser offenses included in the charge of murder where, from the evidence and the reasonable inferences to be drawn therefrom, the jury would be authorized to find that no intention to kill existed. *James* v. *State*, 83 *Ga. App.* 847, 851 (65 S. E. 2d, 55).

The books are replete with cases involving the propriety of the court's failure to charge the law of involuntary manslaughter. Each is decided upon its own peculiar facts and no purpose will be served here in an academic sifting and grouping of those cases.

Since the case must be remanded for a new trial, the remaining assignments of error need not be considered.

*Judgment reversed. Gardner, P.J., and Townsend, J., concur.*