## TAYLOR *v.* THE STATE. PERRY *v.* THE STATE.

1. A "chain-gang" located in a county of this State, in which "convicts"
whose offenses were misdemeanors are confined and worked under the
direction and control of a "guard," is presumably a lawfully estab-
lished county chain-gang, and must be so regarded until the contrary
is made to appear.

2. Though in a joint trial of two persons for murder the statement of one
of them to the jury may be such as to call for a charge upon the law of
voluntary manslaughter, failure to instruct the jury thereon is not, in
the absence of a proper request to charge on this subject, cause for grant-
ing him a new trial, if there is nothing in the sworn evidence which
would warrant a verdict convicting him of this grade of homicide.

3. A homicide having been committed with a weapon hastily "grabbed
up" by the slayer, who had not previously prepared it or placed it
where it lay when he seized it, and there being, on the trial of himself and
another for the murder of the deceased, nothing to show the nature of
this weapon except that it was "a piece of wood" and caused the death,
the conclusion did not necessarily result that it was a weapon likely to
produce death or that the use of it established beyond controversy an
actual intention to kill.

4. If upon such a trial the statement by one of the accused to the jury
warranted a finding of such a state of facts as that above indicated, and
he, admitting that he committed the homicide and not asking for an
acquittal, contended only that his offense should be graded, appropriate
written requests to charge, embracing instructions upon the law of invol-
untary manslaughter, though based upon the statement only, should not
have been refused.

5. When upon such a trial the other accused person stood squarely on his
plea of not guilty, and both joined in presenting such requests to charge,
a refusal to give the same entitled not only the one admitting that he
committed the homicide to a new trial, but also the one denying any
participation therein, if the only theory upon which he could lawfully
have been convicted was that there was a conspiracy between the other
and himself to murder the deceased. This is so because such a theory
would necessarily be inconsistent with the actual slayer's guilt of invol-
untary manslaughter only.

Argued May 15,—Decided July 25, 1899.

Indictment for murder. Before Judge Reese. Wilkes
superior court. February 1, 1899.

*A. W. Stephens* and *H. M. Holden,* for plaintiffs in error.
*J. M. Terrell, attorney-general,* and *R. H. Lewis, solicitor-general,* by *Harrison & Bryan,* contra.

LUMPKIN, P. J.  The plaintiffs in error, Will Taylor and Fred Perry, were jointly indicted and jointly tried for the murder of Jep Dennard.  Both were convicted.  Neither moved for a new trial, but each presented to the judge a separate bill of exceptions which, under a writ of mandamus from this court, was duly certified.  Ante, 380.  The defenses set up by the accused on their trial were essentially different.  Taylor admitted that he committed the homicide, and did not ask for an acquittal.  He "only contended that a verdict of voluntary or involuntary manslaughter as to him should be rendered."  On the other hand, Perry strenuously denied any connection whatever with the killing of Dennard, and earnestly insisted that he was not guilty.  The material facts are as follows: Taylor, Perry, and several others were members of a chain-gang of which Dennard was a guard.  All of the convicts occupied one room of a house and Dennard another.  Taylor and Perry, who were not confined to the chain, entered the latter room and immediately thereafter a struggle ensued in which Dennard received a blow on the head with a weapon of some kind.  As results thereof, he soon lost consciousness and died the next day.  The evidence discloses nothing as to the nature of the instrument with which the mortal wound was inflicted, except that it caused the death of Dennard.  The indictment describes it as "a certain weapon."  The only mention of it at the trial came from Taylor.  He called it "a piece of wood."  He stated to the jury that when he entered Dennard's room, the latter "got after" him about cooking an extra meal for the convicts; and he then proceeded as follows:  "He [meaning Dennard] asked me who gave me authority to cook supper for them.  I told him they didn't have any bread for dinner.  He said: 'I am going to give you hell about it;' and jumped up at me.  I reached down and grabbed up a piece of wood on the side of the woodpile.  I took it and hit him, not intending to kill him.  It was my intention to make an escape.  We run out of the room.  He came to the door.  We all gathered around him.  Fred,

he asked me to take him to the room. I said, no, I wouldn't do it, he might kill me. Stud Baker was the man that helped him carry him to the room. I told the boys to make haste and do what they were going to do. We went about 150 yards. Will Moore cut my chain and I cut his loose, and he cut several more, and we made our escape. It was not my intention to kill him; it was my intention to make my escape. He jumped up; I didn't know what he was going to do, whether he was going to beat me half to death or not. I have nothing further to say about it." The State introduced in rebuttal of Taylor's statement his "testimony taken down on the commitment trial," and also evidence of a declaration he had made at the time of his arrest, that "Fred Perry did the killing." This declaration was, of course, not admissible against Perry for any purpose, and the evidence which was admissible against him was exceedingly weak and unsatisfactory. It did not show actual participation by him in the homicide, and the only theory upon which he could have been convicted was that the killing was done in pursuance of a conspiracy between Taylor and himself to murder Dennard.

In each bill of exceptions it is alleged that both of the accused requested the judge to give in charge to the jury the following written requests, and error is assigned upon his refusal so to do: (1) "If you believe, either from the evidence or from the statements of defendants, that Dennard was endeavoring to inflict corporal punishment upon the defendant Taylor, and to prevent this Taylor struck him the blow that caused his death, then, in order to justify you in finding Taylor guilty of murder, the evidence must satisfy you that Dennard had the right to inflict the punishment, and the burden is on the State to show that he had such right. In this connection, if you believe that at the time of the killing Taylor was a member of a chain-gang of which Dennard was a guard, and that Dennard, as such guard, endeavored to whip him or inflict corporal punishment, before you can find that such attempted punishment was lawful you must believe from the evidence that the chain-gang was a legal one, and the burden is on the State to prove that it was." (2) "If from the evi-

dence, or from the prisoners' statements, you should believe that the person who struck Dennard did not in fact intend to kill him, then, before you can infer such intent from the nature of the weapon used, the evidence must satisfy you that it was a deadly weapon and one likely to produce death, and it would be the duty of the State to prove that it was a weapon likely to produce death. The bare fact that the use of a weapon produced death in a single instance would not, in the absence of all other evidence as to the character of such weapon, justify you in concluding that it was a deadly weapon and one likely to produce death. If the evidence should fail to show that the weapon used was one in its nature calculated to produce death, and if you further believe that the person striking the blow did not in fact intend to kill Dennard, but that nevertheless the blow was unlawful, then you would be justified in finding such person guilty of involuntary manslaughter in the commission of an unlawful act." Each bill of exceptions further complains that the judge refused to give in charge to the jury section 67 of the Penal Code, relating to involuntary manslaughter, though requested in writing so to do; and also, that he failed to charge the jury upon the law of voluntary manslaughter. It does not, however, appear that any request invoking instructions as to this grade of homicide, except the one first above copied, was made. Each of the plaintiffs in error specifically states in his bill of exceptions that the verdict against him was necessarily controlled by the refusals to charge as requested and by the failure of the judge to charge concerning voluntary and involuntary manslaughter. As was held when the applications of Taylor and Perry for mandamus were under consideration, these cases have been brought to this court under the act of December 20, 1898, dispensing with motions for new trials in certain cases, the provisions of which are in accord with a practice frequently recognized before its enactment. See the decisions cited in the mandamus cases, ante, 381.

1. The first request to charge was properly refused. There was nothing, either in the evidence or in the statements of the accused, making an issuable question as to whether the chain-gang of which Taylor and Perry were members had, or had

not, been established according to law. The evidence showed that they were convicts, that they and other convicts were at work as such in a chain-gang (the facts concerning which, so far as disclosed, were in no particular different from those pertaining to a chain-gang lawfully established), and that they were under the supervision and control of a guard. The nature of the work in which these men were engaged was not shown. The foregoing brief summary embraces every material fact throwing any light upon the character of this chain-gang. If it was an unlawful one, it does not appear that either Taylor or Perry so knew, or that their conduct was in any manner affected by their illegal imprisonment. That the plaintiffs in error and their companions were "convicts" necessarily means that they had been duly tried and found guilty of offenses against the laws of this State, and were subject to punishment. As they were not in the penitentiary, their offenses must have been misdemeanors, and it must be presumed that they were properly sentenced by the court, or courts, in which their cases were tried. They were doubtless sentenced to work in a county chain-gang, an institution for which the law provides. They were at work upon a chain-gang answering the description of a county chain-gang, and the lawfulness of it was not brought into question by any fact proved at the trial. Moreover, they were under the direction and control of a person whose designation, "guard," is exactly that which the law applies to one who should have the supervision of convicts. So far, therefore, as the record discloses, there was no reason why the judge should have submitted to the jury any question as to the lawfulness of this chain-gang. As the giving of the first request in charge to them would have done so, the refusal to give it was right. It may be true, in point of fact, that this chain-gang was not lawfully established. If so, it would have been easy to so prove; but certainly no court or jury, under the facts as they appear, would be authorized to presume or find that it was not a lawful chain-gang.

2. The failure of the judge to charge upon the law of voluntary manslaughter was not, under the repeated rulings of

this court, erroneous.    There was nothing outside of Taylor's statement calling for a charge on this subject, and there was no proper request to charge upon it.    *Darby* v. *State*, 79 *Ga.* 64; *Irby* v. *State*, 95 *Ga.* 468; *Carroll* v. *State*, 99 *Ga.* 37.

3, 4.    The law gave Taylor the right to make a statement and also the right to have the jury believe it if they saw proper. In his statement he undertook to tell how the killing occurred. He is not contradicted by anything in the record. He said that he went into the room, that Dennard got after him about the cooking, threatened to give him hell about it, and jumped up at him.    Then he (Taylor) "grabbed up" a piece of wood on the side of a wood-pile and hit Dennard, not intending to kill the guard, but to escape. Dennard was stricken but one blow, which for the time being disabled him only. Taylor and the other convicts did escape.    As stated above, the only mention of the weapon comes from Taylor, who stated that it was "a piece of wood."    It appears to be certain that he did not take it into the room with him, and there is no proved fact to call in question the truth of his statement that he hastily grabbed it up when Dennard made the threat and jumped up at him.    There was no proof at all to show that the weapon was one likely to produce death, except the bare fact that it did kill.    In view of Taylor's admission on the trial that he did the killing, and of the fact that he did not ask for a verdict of not guilty but only that his offense be graded, the refusal of the judge to charge upon the law of either voluntary or involuntary manslaughter was, under the circumstances, equivalent to an adjudication from the bench that Taylor was guilty of murder, and the charge given amounted to an instruction to the jury to convict him of that offense.    This certainly can not be upheld unless, under Taylor's own statement, he was guilty of murdering Dennard.    The judge was right in refusing to charge on voluntary manslaughter; for, as has been shown, no charge on this subject was properly invoked.    But was he right in refusing to charge upon the law of involuntary manslaughter?    Surely not, unless the evidence and the statement demanded a verdict of murder; for Taylor had in due form presented requests calling for instructions on the law

of involuntary manslaughter, and was entitled to have them given, if warranted by his statement. *Hayden* v. *State*, 69 *Ga.* 732 (3); *Underwood* v. *State*, 88 *Ga.* 47. Can it fairly be said that his statement was, in effect, a confession that he was guilty of murder? Could not a jury, if they believed it fully, have properly found him guilty of involuntary manslaughter? If the first of these questions could be answered "no," and the second "yes," it was a very grave and serious thing to deny Taylor the right to have these questions answered by the jury. We do not think the statement was such a confession, and, taking it as true, a jury would not have been unwarranted in saying that the offense was not murder. It was not affirmatively shown that the "piece of wood" was a weapon likely to produce death, and the mere fact that death resulted from its use did not necessarily make the killing murder. *Ray* v. *State*, 15 *Ga.* 223; *Henry* v. *State*, 33 *Ga.* 441. In no view of the case ought Taylor's right to go to the jury on these matters to have been cut off.

In this connection the case of *Jackson* v. *State*, 76 Ga. 473, is worthy of careful consideration. Jackson shot and killed a convict. He aimed a gun loaded with buckshot at the convict, fired it intentionally, and killed him. Jackson set up involuntary manslaughter as a defense, claiming, it seems, that he shot not intending to kill but merely to disable the convict and prevent his escape from custody. The court in that case held that the question of the intention with which the shooting was done—whether to kill or merely to disable—was one for the jury; and the principle laid down in the third headnote, page 474, is as sound as pure gold. It is: "There can be no involuntary manslaughter where the intention is to kill. If there is any evidence to raise a doubt, even though slight, as to the intention to kill, the court should give in charge the law of involuntary manslaughter." Of course, a prisoner's statement, if believed by the jury, may constitute the basis of such a doubt, as well as sworn evidence. If Taylor's statement is true, the case does not necessarily fall within the proviso in section 67 of the Penal Code, which declares that "where such involuntary killing shall happen

in the commission of an unlawful act which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a riotous intent, or of a crime punishable by death or confinement in the penitentiary, the offense shall be deemed and adjudged to be murder." His statement does not make it affirmatively appear that the "piece of wood" with which he struck the deceased was a deadly weapon the use of which would naturally tend to destroy life, or that the blow was inflicted in the prosecution of a riotous intent. Nor, in attempting to effect his escape, was Taylor engaged in a criminal enterprise amounting to a felony, the offense of making an escape from a county chain-gang being merely a misdemeanor. Penal Code, § 314.

5. There is in Perry's bill of exceptions one point which we have not stated. It is unnecessary to do so. Taylor is entitled to a new trial for the reasons above given, and it follows inevitably that a new trial must be granted to Perry. He joined in the requests made by Taylor which ought to have been given, and the refusal to give them injured Perry no less than Taylor; for if the latter, as the jury might have found, was guilty of involuntary manslaughter only, Perry could not have been properly convicted of any crime. He was found guilty solely upon the theory that there was a conspiracy between Taylor and himself to murder Dennard. As there could not possibly be a conspiracy to commit involuntary manslaughter, a finding that Taylor was guilty of this offense would have necessitated Perry's acquittal.

*Judgment in each case reversed. All the Justices concurring.*