## 907.  WARNACK *v.* THE STATE.

1. The assignments of error on the charge relating to sections 70, 71, and 73 of the Penal Code are fully controlled by the decisions of this court in *Lightsy* v. *State.* 2 *Ga. App.* 442 (58 S. E. 686), and *Holland* v. *State,* ante, 465 (60 S. E. 205).
2. Where the evidence and the statement, taken together or separately, raise a doubt, although slight, as to the intention to kill, the law of involuntary manslaughter should be given in charge.  And where the act from which death results may or may not be lawful under the facts, both grades of the law of involuntary manslaughter should be given in charge.
3. Brothers have the right of mutual protection under the law.
4. The right which the law gives to a brother to defend a brother when in peril, and if need be to take life in such defense, does not necessarily depend on whether the brother himself is blameless or at fault.  If the brother who interposes is himself blameless in connection with such attack, his right to interpose may be justified by a real or apparent necessity presented by the facts and circumstances as they appear to him at the moment of his interposition in behalf of his brother.

Conviction of manslaughter, from Whitfield superior court— Judge Fite.  November 21, 1907.

Argued January 14,—Decided February 11, 1908.

Claude Warnack was indicted for murder, and on his trial was

convicted of voluntary manslaughter. The State introduced one witness to the homicide, who testified in substance as follows: Claude and Jim Warnack were brothers, and, on the day of the homicide, were at work on the farm of Chess Wilson, the. deceased. They had hauled up from the fields and delivered the portions of the corn belonging to the defendant and the deceased. The wagon belonged to the deceased, and they asked him if they could have the use of the wagon to haul Jim's portion of the corn to the Caylors, about a mile distant. Both brothers were sitting on the wagon when the request was made, and a fence was between them and the deceased. The deceased refused at first to let them have the wagon, but, after a few words, consented to let them have it, provided they would pay him for the use of it, saying that "it cost something to keep a team." Jim replied that "it didn't cost anything to be a damn rascal." The deceased asked "who he was talking to;" he said, to him; and then the deceased got over the fence, and, with a plank in his hand, went towards Jim, saying that he had to take that back. Jim got down off the wagon and they met. The deceased, who was left handed, took hold of Jim by the collar, and, holding the plank in his right hand, declared that Jim had to take back his language. The witness did not know where the deceased got the plank he had in his hand. This plank would weigh about four pounds, was two feet long and about one inch thick, and six inches wide. "A man could very easily kill another with it." The deceased had Jim in his collar. Jim was not doing anything, and the evidence does not show that he had any weapon or anything in his hands. The deceased was not trying to hit Jim with the plank, but was cursing him and telling him that he had "to take that back." While the struggle was going on, the defendant, who was sitting on the wagon, without saying anything, took up the brake-stick, and, jumping off the wagon, went to them and hit the deceased with this stick on the head. The blow was from behind the deceased, and was a hard one, the defendant using both hands. The brake-stick will weigh about ten pounds, and is about seven feet long and two inches thick. The lick knocked the deceased down. The witness went to the deceased and raised him up and asked if he was hurt much; the deceased replied that he thought not. His skull was factured, and he died from the effects of the blow in eight days. The broth-

ers, immediately after the blow, walked away. The sheriff could not find the defendant for two weeks. He was notified by the defendant's uncle that he was in Knoxville, and he went there and found him arrested and in jail. There was some evidence, not very strong, that the defendant felt unkindly towards the deceased. The physician who examined the fractured skull testified that the blow could have been given from either in front or behind, though his opinion was that the blow was from behind. Judging from the extent of the injury, the blow was a hard one. The skull of the deceased was not up to the average in thickness.

Jim Warnack, the brother of the defendant, testified in substance as follows: He asked Chess, the deceased, to lend him his wagon, and Chess replied that he would, if he would pay for it, as it cost something to feed a team. "I says, 'It don't cost anything to act the damn rascal with a fellow.' He grabbed up a piece of plank inside of the fence, and came over the fence, and says 'God damn you, you can't call me a damn rascal.' I got off the wagon when I seen him come over the fence, and turned around to keep him from hitting me in the back of the head. He grabbed me in the collar with his right hand and had the plank in his left hand, and commenced striking me. Claude says, when he got over the fence, 'Don't hit him with that stick, Chess.' Chess just reached out and grabbed me and says, 'God damn you, take it back;' and Claude commenced taking up the brake-stick, and says, 'Turn him loose, Chess;' and Chess says, 'God damn you, take it back;' and Claude got down off the wagon, and Chess says, 'God damn you,' and drawed back to hit me with the plank; and Claude says, 'Turn him loose,' again, and Chess drawed back to hit me with the plank, and Claude hit him. Claude was standing to the side of Mr. Wilson when he hit him. He did not step up behind him. I never made any effort to strike Mr. Wilson, and never used any opprobrious words except those I admit using at first. Claude asked Mr. Wilson to let me loose, twice, and told him not to hit me. Wilson was much larger than my brother, and a better man physically. Wilson was somewhere about thirty years old. I was nineteen, and my brother Claude twenty-one, and both of us are married. The plank Wilson had and was drawing on me weighed about four or five pounds and was large enough to kill a man with. He tore my shirt at the collar, when he had hold of me.

Chess had me by the collar and was cursing me, and was drawing back the plank to hit me, when my brother struck him."

The defendant, in his statement, corroborated his brother as to the cause of the difficulty between his brother and the deceased, and said: "I said, 'Chess, don't hit him.' He grabbed up the stick in his left hand, and grabbed Jim with his right hand, and shook him around about the front wheel of the wagon. I was up on the wagon. I told him twice to turn Jim loose, but he wouldn't. He says, 'God damn you, take it back.' Jim said nothing. Then Chess said again, 'God damn you, take it back, or I will fix you with this stick;' and he made just about a fourth of his lick, when I hit him. He fell down, and we turned around and walked over home. I had no intention in the world to kill him. Me and him was about as good friends as there was in the county, I reckon. I never made any threats or attempted to do anything to him. We was all good friends. I was sorry that it happened."

A motion for a new trial was made on numerous grounds, the material ones being that the court erred in charging § 73 of the Penal Code, and also in charging that section in connection with and as qualifying §§ 70 and 71, the full charge on these points being as follows: "Justifiable homicide is the killing of a human being in self-defense, against one who endeavors by violence or surprise to commit a felony on the person killing. A bare fear of any of those offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable man, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge. Again, if a person kill another in his defense, it must appear that the danger was so urgent and pressing at the time of the killing that, in order to save his own life, or to prevent a felony being committed upon him, the killing of the other was absolutely necessary; and it must also appear that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given." Also that the court erred in not charging the law of involuntary manslaughter; also in leaving to the jury to decide, as a question of law, the right of one brother to defend another, or whether such relationship stood upon the same footing of reason and justice as

38

that of parent and child; and also erred in the following charge: "If you should come to the conclusion that it stands upon the same footing of reason and justice, I charge you that he would stand in the same light as the defendant, Jim, his brother, would be if he had done the killing and was here on trial. In other words, if Jim had done the killing, and the killing had been murder, then the defendant would be guilty of murder. But if Jim had done the killing, and the killing would have been voluntary manslaughter, then the defendant would be guilty of voluntary manslaughter; but if Jim had done the killing, and the killing would be justifiable homicide, then the defendant would not be guilty of any offense."

*William E. Mann, George G. Glenn,* for plaintiff in error.

*Samuel P. Maddox, solicitor-general, W. C. Martin,* contra.

HILL, C. J. (After stating the facts.)

1. This court has, in *Lightsy* v. *State,* 2 *Ga. App.* 442 (58 S. E. 686), and in *Holland* v. *State,* ante, 465 (60 S. E. 205), fully covered the exceptions made to the charge of the court relating to sections 70, 71, and 73 of the Penal Code, defining the two branches of the law of justifiable homicide. Following numerous decisions of the Supreme Court, we have endeavored to clearly point out the difference between these sections, as applicable to the law of justifiable homicide therein embraced, and to indicate the cases to which the sections are respectively applicable, and in what manner they should be given in charge where applicable. Applying the law as laid down by these decisions to the facts in this case, we think the court erred in charging §73 of the Penal Code; and also in charging this section in such a manner as to lead to the conclusion that it qualified and restricted the right of self-defense as defined in sections 70 and 71. In no view of the evidence in this case was there any mutual combat. Mutual combat, in the meaning of §73, is a mutual fight following a mutual intention to fight with felonious purpose. The defendant was certainly not engaged in any combat with the deceased; nor was his brother, in whose behalf he interfered and struck the fatal blow, engaged in a fight with the deceased, at the time the blow was given. The deceased had hold of the defendant's brother with his left hand, and was threatening him with a stick, which he held in his right hand, unless he took back the opprobrious words that he had used to him. The

brother had no weapon of any sort, and, according to the testimony for the State, was doing nothing to the deceased, but was simply standing in a passive attitude, and not in any manner resisting, by combat with the deceased, the assault which the deceased was making upon him because of such opprobrious language. It is perfectly clear, therefore, that the law of justifiable homicide resulting from mutual combat has no application to the facts in this case.

2. In our opinion, the court should have given in charge the law of involuntary manslaughter. When, from the evidence or the statement, some doubt, although slight, might arise as to the intention to kill, the court should give in charge the law of involuntary manslaughter. If, in addition to the doubt of intention to kill, there is also some question as to whether the act from which death resulted was an unlawful or a lawful act, both grades of involuntary manslaughter should be submitted to the jury. *Jackson* v. *State*, 76 *Ga.* 474; *Taylor* v. *State*, 108 *Ga.* 384 (34 S. E. 2); *Farmer* v. *State*, 112 *Ga.* 80 (37 S. E. 120); *Jordan* v. *State*, 124 *Ga.* 780 (53 S. E. 331); *Dorsey* v. *State*, 126 *Ga.* 633 (55 S. E. 479); *Joiner* v. *State*, 129 *Ga.* 295 (58 S. E. 859). The evidence shows no previous ill feeling between the parties, no premeditation or preparation. The anger of the deceased was aroused by the opprobrious words used to him by the defendant's brother. He grabbed up a plank and went over the fence separating him from the brothers, took hold of the collar of the brother who had used the opprobrious language, and demanded with an oath that he take back the language, at the same time holding the plank in a threatening position. The defendant, seeing the attack upon his brother, hastily took up the brake-stick from the wagon in which he was sitting, and struck the deceased on the head. The one witness for the State says that he struck him from behind and without a word of warning. The brother testified that the defendant struck the deceased from the side, and after repeated requests made by him to the deceased not to hit his brother, and to "turn him loose." The statement is to the same effect. Taking the evidence as a whole, we think the law of justifiable homicide in self-defense, as defined by sections 70 and 71 of the Penal Code, and manslaughter, both voluntary and involuntary, was applicable. If the jury believed that the defendant struck the blow in defense of his brother against one who was at the time really or apparently

endeavoring by violence to commit a felony on his person, and the circumstances were sufficient to excite the fears of a reasonable man that such was the purpose of the deceased, the defendant would be justifiable. If he struck the deceased not for the purpose of defending his brother from what he honestly believed to be a felonious assault, but from sudden heat of passion aroused by the attack upon his brother, intending to kill the deceased, he would be guilty of voluntary manslaughter. If he struck the deceased with no intention to kill, and only to prevent injury to the person of his brother, less than a felony, he would be guilty of involuntary manslaughter. If, under all the circumstances, he had no legal right to interfere at all to prevent an injury to his brother, but he did so without any intention to kill, but simply to prevent such injury, he would be guilty of involuntary manslaughter in the commission of an unlawful act. If, however, under all the circumstances, he had the right to interfere to prevent the deceased from striking his brother with the plank, even though he thought that the deceased intended only to assault and beat, and not to seriously injure his brother, and he struck suddenly, with no intention to kill, his offense would be involuntary manslaughter in the commission of a lawful act without due caution and circumspection. There is some evidence in the record to authorize either one of the conclusions above indicated, and the court should have given in charge the law applicable to each one of them.

3. The right of a brother to defend a brother is a legal right, and the court should have so charged, and not have left the question to the jury as one of fact. Under the common law, the right of defense was given to nearly all of the domestic relations, and it certainly can not be doubted that this right is given by the law to brothers, brothers and sisters, sisters, and husband and wife, as well as to parents and children. Section 74 of the Penal Code, in expressly giving the right of mutual protection to parents and children, was not intended to be exclusive, for section 75 gives the same right of mutual protection to all other relations which stand upon the same footing of reason and justice as those of parents and children; and certainly the right of the brother to protect his brother falls within this category. *Armistead* v. *State,* 18 *Ga.* 708; *Alexander* v. *State,* 118 *Ga.* 27 (44 S. E. 851).

4. Under the special facts of this case, the court did not commit harmful error in making the right of the brother who was assaulted by the deceased the criterion by which to determine the right of the defendant. The defendant heard the provocation in the use of the opprobrious words by his brother; he saw the size of the plank with which the deceased made the assault, and he was probably as fully informed as his brother of all the facts and circumstances—the res gestæ—of the difficulty between his brother and the deceased. Let us briefly consider the case from the standpoint of the brother who was assaulted by the deceased. Under section 103 of the Penal Code, opprobrious words may justify a simple assault, or an assault and battery, but they do not justify an attack with a deadly weapon. Therefore, if the deceased was making an assault upon the brother with a weapon likely to produce death, or was really or apparently about to commit a felony upon his person, the fact that the latter had provoked the attack by opprobrious words would not take away his right of self-defense. And what the brother assaulted could do for himself in his defense his brother could do for him. We would not, however, be understood as holding that a brother who interposed to defend a brother from an apparently felonious assault would not in any case be justifiable unless the brother who was being assaulted would himself be justifiable. This question is to be determined by the facts and circumstances as they appear to the brother who interposes for the purpose of defense. We can imagine cases where the defendant brother would be justifiable in defending his brother, where the brother himself might not be blameless. His conduct is not to be judged by the actual facts, but by the facts as they appeared to him at the moment of his interposition in behalf of his brother. *Alexander* v. *State,* 118 *Ga.* 27 (44 S. E. 851), People *v.* Curtis, 52 Mich. 616 (18 N. W. 385).

For the reasons stated, we think the case should be again tried.

*Judgment reversed.*