## 57307. SIMPSON v. THE STATE.

McMURRAY, Presiding Judge.

After a shooting incident on November 4, 1974, which resulted in the death of one Barry Williams, defendant was arrested. A preliminary hearing was held during November of 1974 and he was bound over to the superior court on the charge of murder. He was indicted on January 14, 1975. He was tried by a jury on December 21, 1977, and found guilty of involuntary manslaughter in the commission of an unlawful act and sentenced to serve four years in a state penitentiary. A motion for new trial was filed and denied. Defendant appeals. *Held:*

Defendant first contends that the trial court erred in failing to dismiss the indictment against him for lack of a speedy trial. There is nothing in the record to indicate that defendant made a demand for trial prior to his motion

to dismiss the indictment filed the day before trial.

Defendant argues that the 34 month delay between his arrest on November 4, 1974, and his arraignment in September of 1977 is a violation of his speedy trial rights. While Code Ann. § 27-1401 (Ga. L. 1966, pp. 430, 431; 1977, pp. 1098, 1104) requires the court to fix a date on which the defendant shall be arraigned, no period of time is specified. *Brand v. Wofford,* 230 Ga. 750 (199 SE2d 231). In the present case, the record is silent as to arraignment which is alleged to have occurred in September of 1977, but an examination of the indictment reveals that defendant's attorney waived arraignment and entered a plea of not guilty on the day of trial.

The constitutional right to a speedy trial becomes operative when one becomes an accused and prosecution commences either by formal accusation or arrest. United States v. Marion, 404 U. S. 307 (92 SC 455, 30 LE2d 468); *Harris v. Hopper,* 236 Ga. 389 (224 SE2d 1). While there is a burden on a defendant to protect his right to a speedy trial, failure to make such a demand under Code § 27-1901 does not amount to a waiver of Sixth Amendment rights. *Sanders v. State,* 132 Ga. App. 580 (208 SE2d 597). However, a defendant's assertion or failure to assert his statutory right is only one of the factors to be considered in determining whether or not his Sixth Amendment rights have been violated. Under the guidelines set forth in Barker v. Wingo, 407 U. S. 514 (92 SC 2182, 33 LE2d 101), four factors must be considered: (a) length of the delay, (b) the reason for the delay, (c) the defendant's assertion of the right, (d) actual prejudice to the defendant.

A three-year delay between arrest, indictment and trial is not a speedy trial. However, "[t]he mere passage of time is not enough, without more, to constitute a denial of due process." *Hughes v. State,* 228 Ga. 593, 595 (la) (187 SE2d 135). See also *Sanders v. State,* 132 Ga. App. 580, supra; *Dansby v. State,* 140 Ga. App. 104 (230 SE2d 64); *Fleming v. State,* 240 Ga. 142 (240 SE2d 37).

The record in the case is silent as to the reason for the delay. The Supreme Court in Barker v. Wingo, 407 U. S. 514, supra, points out that a deliberate attempt by the government to delay the trial in order to hamper the defense should be weighed heavily against the

government while a more neutral reason such as negligence or overcrowded courts should be weighed less heavily although they are factors to be considered. As there is no allegation that the delay was a deliberate attempt to hamper the defense, we must next consider whether the delay was either oppressive or prejudicial in view of the state's apparent negligence in bringing defendant to trial. See *McClendon v. State,* 237 Ga. 655 (229 SE2d 427).

The only evidence contained in the record of defendant's objection to the delay or his assertion of his right to a speedy trial was his motion to dismiss the indictment which was filed on December 20, 1977. He was tried the following day. "Appellant's delay in asserting her right is a factor which we must weigh heavily against her. United States v. Greene, 578 F2d 648 (5th Cir. 1978)." *Haisman v. State,* 242 Ga. 896, 897 (2), 898 (252 SE2d 397).

In Barker v. Wingo, supra, the court set forth the interests of an accused which were to be protected by the right to a speedy trial: (i) to prevent oppressive pre-trial incarceration, (ii) to minimize anxiety and concern of the accused, (iii) to limit the possibility that the defense will be impaired. In the present case, there was no oppressive pre-trial incarceration because the defendant was released on bond from November 1974 until he was tried. While the defendant may have been anxious and concerned, it appears that defendant was not anxious and concerned to go to trial and took his chances with the possibility that the murder charge would either be dropped or not be pursued by the state. See *State v. Weeks,* 136 Ga. App. 637 (222 SE2d 117). This belief is reinforced by defendant's admission that he did not retain counsel after his attorney died, but waited until he was notified that he was going to be arraigned in September 1977. Defendant's general allegation that his defense was impaired because of loss of witnesses and a failure of memories is insufficient to establish prejudice from delay in bringing him to trial. United States v. Zane, 489 F2d 269 (5th Cir.) (cert. den. 416 U. S. 959 (94 SC 1975, 40 LE2d 310)). As to his inability to locate his first attorney's file containing investigative notes, we find that defendant

failed to act promptly to obtain his file when he learned that Mr. Johnson had died. When he was informed of his attorney's death, he should have taken action to prepare for his defense rather than wait to be arraigned before employing new counsel and then attempt to locate his file. See *Haisman v. State,* supra.

Thus, we have balanced each of the four factors as required by Barker v. Wingo, supra, and find that the trial judge correctly held that defendant had not been denied his right to a speedy trial.

2. The defendant next contends that the trial court erred in refusing to give a written request to charge. Defendant had made a timely written request to charge on both Code Ann. § 26-1103 (a) (Ga. L. 1968, pp. 1249, 1276) (Involuntary Manslaughter in the Commission of an Unlawful Act) and Code Ann. § 26-1103 (b), supra (Involuntary Manslaughter in the Commission of a Lawful Act in an Unlawful Manner). The trial court charged the provisions of Code Ann. § 26-1103 (a), supra, but declined to charge the provisions of Code Ann. § 26-1103 (b), supra. When the jury was recharged the judge gave Code Ann. § 26-1103 (a) and (b). Apparently realizing that he had charged (b) the judge said: "Now, now. A person — belay that, the last. Let me charge you this" and repeated Code Ann. § 26-1103 (a). He then proceeded to instruct them that they could find the defendant guilty of murder, voluntary manslaughter or involuntary manslaughter in the commission of an unlawful act.

The transcript of the evidence at the trial does not support defendant's assertion that the provisions of Code Ann. § 26-1103 (b), supra, should have been charged by the trial court upon defendant's written request. In the inception, the defendant was indicted and tried for the offense of murder. The trial court charged on the offense of murder and the lesser offenses of voluntary manslaughter and involuntary manslaughter in the commission of an unlawful act. A charge on justifiable homicide was also given. However, after deliberation the jury returned a verdict finding the defendant guilty of involuntary manslaughter in the commission of an unlawful act.

A witness for the state testified that he (a passenger)

and the decedent were riding in decedent's automobile and went by a playground where decedent got out and talked to the defendant. After they talked the decedent came back, got into his automobile and he and the witness drove to defendant's home where they parked in front of defendant's home until the defendant could get there. This witness was seated on the passenger's side and the decedent on the driver's side. The witness further testified that the defendant "came by and said he would be right back in a minute, so he passed on by the car and went into the house. Me and Barry [decedent] were sitting in the car talking . . . and then Dike [defendant] came out of the house, he walked up to the car, reached in and pulled out a gun . . . [a]nd he just started pulling the trigger. He shot one time and I jumped out of one side of the door and Barry [decedent] was jumping out behind me. I stood up and started to run and Barry [decedent] was standing in the parking [sic] holding himself, his shoulder, neck something like that, you know. He was holler'n [sic] so Dike [defendant] came around and got in front of his head and started shooting."

The evidence at trial revealed that the decedent suffered four gunshot wounds. "One bullet entered the right side of the nose, passed to the left, exited just to the front of the left ear. The second bullet entered the right cheek and exited through the mouth knocking out several teeth . . . There were two wounds on the left side of the chest and a through and through wound on the left forearm. The bullet which pierced the forearm entered the left chest and passed transversely across the chest, came to rest . . . under the skin of the upper chest — of the right chest. The other bullet entered the left chest and penetrated the liver, coming to rest under the skin of the right chest."

The testimony of the defendant was that the decedent had hit him on approximately five previous occasions; that the decedent had been demanding defendant pay him some money when he (defendant) did not owe decedent the money; and that he had tried to avoid the decedent. On the day of the incident in question defendant was in his home and was preparing to leave to go to his cousin's house. Defendant looked out a window

and saw the decedent's automobile parked in front of his (defendant's) home. In response to direct examination by his counsel defendant testified: "Q. So you're getting ready to leave and see him out the window — what do you do? A. So, I go to my mother's room and I get the gun, I put it into my — ah — pants—Q. Now, why did you do that? A. I was just going — you know — was going to protect myself. I had no — I really had no intention of killing anyone. I just put it in there to sort of maybe scare him off if he tried to bother me. Q. Okay. What happened then? A. Well, I put the gun in my pants and I proceeded on because I'm going to my cousin's house. And after I get to the door, I go out the door and I get to the sidewalk. I walk down the sidewalk— Q. Now, this is a stone walkway? A. Yes, brown stepping stone. And I walk my usual way out because my mother's car, at the time, was in the driveway and I couldn't get out. So I — the only way I could have gone was really out the sidewalk. And I ventured off and I got about — I couldn't say exactly, but a few feet in front of the car, and I guess he noticed that I was going to just go ahead on and leave him right there. And he call [sic], you know, he said, 'Come here.' Q. Now, tell me, did you invite him to your house? A. No, I did not. Q. Did he have any business at your house? A. No, he didn't. Q. Okay. He called you over to the car. Now what happens? A. He called me over to the car. I ventured over to the car, not too close — I'd say about an arm's reach — and when I got over to the car, he made an effort — he reached out the window to grab. Q. And what did you do? A. When he reached out the window to grab me, I pulled the gun and I didn't have no intention to shoot — I thought maybe I could scare him and I just panicked you know. Because he was coming — you know, he was reaching for me — he was grabbing for me and I thought he was going to hurt me. Q. The gun went off. You must have pulled the trigger, obviously? A. Yes, I pulled the trigger, and I just panicked. Q. What happened after that? A. . . Barry [decedent] got out of the car, ventured to — got out of the passenger's side and ventured off a little bit and went across the street. And right there against the house he was lying still . . . Q. . . Dike [the defendant], did you mean to shoot him — did you mean to kill this man, to hurt him? A. No, sir, I did not. I

had no intentions of killing nobody. He just grabbed for me and I drew the gun and had it."

In response to cross examination by the assistant district attorney in reference to previous incidents of the decedent's encounters with the defendant, the defendant testified: "Q. Did you ever call the police? A. No, I did not. Q. Did you ever make a report to anyone that — any law enforcement authority — that this man was bothering you? A. No, I did not. Q. You didn't go down and take out any warrant charging him with simple assault — simple battery? A. No, I did not."

In response to further cross examination the defendant testified: "Q. Why did you venture over to the car? A. Because he called me. Q. But isn't this the man that you say you were afraid of? A. Yes. Q. But you go over to the car? A. What am I supposed to do, I don't know. Q. Before you went outside, you went in your mother's room and you got the pistol, is that right? A. Yes. Q. The pistol was loaded? A. Yes, it was. Q. And you put it in your pants? A. Yes, I did." Defendant admitted on cross examination that he did not have a permit (license) for the weapon.

The evidence on the trial of the case was amply sufficient to support the jury verdict finding the defendant guilty of a violation of Code Ann. § 26-1103 (a), supra, but there was no evidence warranting a charge on the provisions of Code Ann. § 26-1103 (b), supra, although a written request to charge same had been made by the defendant. See *State v. Stonaker,* 236 Ga. 1, 2 (222 SE2d 354).

*Judgment affirmed. Quillian, P. J., Underwood and Carley, JJ., concur. Banke, J., concurs specially. Deen, C. J., Smith, Shulman and Birdsong, JJ., dissent.*

ARGUED FEBRUARY 13, 1979 — DECIDED JULY 6, 1979 — REHEARING DENIED JULY 19, 1979 — 

*Galin & Friedman, Stanley H. Friedman,* for appellant.

*Andrew J. Ryan, III, District Attorney, Robert M. Hitch, III, Stephen R. Yekel, Assistant District Attorneys,*

for appellee.

BANKE, Judge, concurring specially.

I concur with Division 1 of the majority opinion. With regard to Division 2, I concur in the holding that there was no evidence warranting a charge on the provisions of Code Ann. § 26-1103 (b). Although the defendant denied having any "intention to shoot," he admitted shooting the victim four times. Thus we are not faced with a situation where the defendant admits the act but denies any intention to kill, as was the case in *Jackson v. State,* 143 Ga. App. 734 (240 SE2d 180) (1977). See also *Jackson v. State,* 234 Ga. 549 (216 SE2d 834) (1975).

A careful reading of these two cases convinces me that we seemingly are tending to obscure further for the bench and bar a rather confused mix of legal principles which we have unnecessarily intertwined. I refer to the lesser included offense of involuntary manslaughter and its interaction with the affirmative defense of self-defense as it appears in both *Jackson* cases, supra, as well as the case before us. Language in both of these cases, if not clarified, will make it difficult for trial attorneys and trial judges to properly distinguish the difference between self-defense, on the one hand, and involuntary manslaughter on the other. The principles involved require some separation, as we indicated in *Tate v. State,* 123 Ga. App. 18 (2) (179 SE2d 307) (1970). In that case, the defendant shot his butcher knife-wielding wife in a domestic quarrel, claiming self-defense at trial, and complaining on appeal that the trial court erred in refusing to charge on involuntary manslaughter. This court said "[I]f the defendant did not actually intend to kill his wife, as disclosed by his unsworn statement, he nevertheless committed an aggravated assault . . . under Code Ann. § 26-1302, *unless he acted in self-defense, in which event his act would show no offense. Thus he was not engaged in the commission of an unlawful act other than a felony, which is the felony offense of involuntary manslaughter (Code Ann. § 26-1103 (a)), and he was not engaged in the commission of a lawful act in an unlawful manner, which is the misdemeanor offense of involuntary manslaugther (Code Ann. § 26-1103 (b))."* (Emphasis

supplied.)

In the instant case, the defendant was, by his version, pointing a loaded weapon at his adversary. This would be permissible if done in self-defense. The discharge of the weapon could also have been accidental. Neither of these issues are before us. Noticing them, however, is useful to the compartmentalization necessary for a proper analysis. Driving one's car on the state's highways is a lawful act. To do so at excessive speed, recklessly, or while intoxicated is to do so in an unlawful manner. Target shooting of a rifle is often a lawful act, but one which can be made unlawful by statute or ordinance in some circumstances. Target shooting where prohibited would be an unlawful act other than a felony. *Intentionally* shooting another person, on the other hand is never lawful unless done in self-defense, in which case it is no crime at all.

I would affirm the judgment of the trial court.

DEEN, Chief Judge, dissenting.

While I fully concur with Division 1 of the majority opinion, I must dissent from Division 2 wherein the majority holds that there was no evidence warranting a charge on the provisions of Code Ann. § 26-1103 (b) although the defendant made a timely written request for such a charge.

Simpson testified that he had been assaulted several times in the past by the victim and that on the day of the shooting Williams demanded money from him. After this meeting, appellant went home, changed his clothing, got his mother's handgun and put it in his pants because he wanted to protect himself and scare off Williams if he tried to bother him again. He further testified that when he left his home on his way to his cousin's house, the victim was sitting inside an automobile which was parked beside the sidewalk in front of his house. The defendant claims that Williams called him over to the car and reached out of the window to grab him when he was about a foot from the car. He maintains that he pulled out the gun intending to scare the victim, and it went off.

The record shows that the trial court charged the jury on self-defense, but refused to give appellant's requested

charge on Code Ann. § 26-1103 (b). However, when the jury returned for a requested recharge the judge gave Code Ann. § 26-1103 (a) and (b) Apparently realizing that he had charged (b) the judge said: "Now, now. A person — belay that, the last. Let me charge you this" and repeated § 26-1103 (a). He then proceeded to instruct them that they could find the defendant guilty of murder, voluntary manslaughter or involuntary manslaughter in the commission of an unlawful act, but he did not instruct them that they could find the defendant guilty of involuntary manslaughter in the commission of a lawful act in an unlawful manner. At no point did the judge instruct the jury to disregard his instruction on § 26-1103 (b).

I believe that the evidence presented by the defendant, if believed by the jury, would be sufficient for them to find that he was doing a lawful act (defending himself) in an unlawful manner (using excessive force). The refusal to grant such a request is clearly error in view of the charge on self-defense and the case law on this issue. The Supreme Court, in *Jackson v. State*, 234 Ga. 549, 551 (216 SE2d 834) (1975) (a full bench decision with two justices concurring in the judgment only), addressed this issue and held: "[w]hen a defendant on trial for murder admits the act but denies the intention to kill, Code Ann. § 26-1103 deserves special scrutiny . . . Code Ann. § 26-1103 (b) provides: 'A person commits involuntary manslaughter in the commission of a lawful act in an unlawful manner when he causes the death of another human being, without any intention to do so, by the commission of a lawful act in an unlawful manner likely to cause death or great bodily harm.'

"The defendant here urges that the 'lawful act' was self-defense and that the 'unlawful manner' was the use of unnecessary (excessive) force. Defendant cites *Warnack v. State,* 3 Ga. App. 590 (60 SE 288), in support of this contention. . .

"The defendant's trial counsel requested and the court gave instructions as to self-defense, which requested instructions left open (the use of more force than necessary) the possible application of Code Ann. § 26-1103 (b). Now the defendant's counsel appointed for

appeal complains that the court did not fill the gap in the instructions given at defendant's request.

"We feel certain that if the defendant had requested a charge pursuant to Code Ann. § 26-1103 (b), the trial judge would have given it. The defendant did not do so, . . . [and] will not be heard to complain that the trial court failed to give a complete charge."

In *Jackson v. State,* 143 Ga. App. 734 (240 SE2d 180) (1977), the same issue appeared before this court, but the defendant had made a timely written request for a charge on § 26-1103 (b). In a full bench decision (two judges dissenting and one not participating), this court, closely tracking the Supreme Court decision and expressly overruling a line of cases to the contrary, held that it was reversible error for the trial court to deny the defendant's request to charge when it was timely submitted.

In view of the confusing recharge, the fact that there was evidence to justify a charge on Code Ann. § 26-1103 (b) and the charge on self-defense (see also *Stonaker v. State,* 236 Ga. 1 (222 SE2d 354) (1976)), and the instruction to the jury limiting it as to the type of verdict it could return, I believe that this case should have been reversed and remanded for retrial.

I am authorized to state that Judge Smith, Judge Shulman and Judge Birdsong join in this dissent.