## 66473. DOLLAR v. THE STATE.

McMurray, Presiding Judge.

Defendant was indicted for murder and convicted of voluntary manslaughter. On appeal, defendant enumerates three errors in which he challenges the sufficiency of the evidence, the trial court's charge on his insanity defense, and the trial court's refusal to charge on involuntary manslaughter. *Held:*

1. "A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person. . . ." OCGA § 16-5-2 (a) (formerly Code Ann. § 26-1102 (Ga. L. 1968, pp. 1249, 1276)). The evidence adduced at trial provided a more than sufficient basis upon which a rational trier of fact could have found defendant guilty of voluntary manslaughter beyond a reasonable doubt. Consequently, defendant's attack on the sufficiency of the evidence is without merit.

2. The trial court instructed the jury that the defendant had the burden of proving his alleged insanity by a preponderance of the evidence. "In Georgia it remains the rule that an accused who asserts insanity as a defense has the burden of proving his insanity by a preponderance of the evidence." *Williams v. State,* 249 Ga. 839, 842 (5) (295 SE2d 74). See OCGA § 16-2-3 (formerly Code Ann. § 26-606 (Ga. L. 1968, pp. 1249, 1270)). Consequently, defendant's contention that the court's charge on insanity was unconstitutionally burden-shifting is without merit.

3. Defendant's remaining enumeration of error contends the trial court erred in refusing to instruct the jury on involuntary manslaughter after timely written request. OCGA § 16-5-3 (a) (formerly Code Ann. § 26-1103 (a) (Ga. L. 1968, pp. 1249, 1276)) provides: "A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony." In *Arnett v. State,* 245 Ga. 470, 473 (265 SE2d 771) it was held "[i]t is error not to charge on involuntary manslaughter, upon request, where there is slight evidence warranting the charge. This is a question of fact to be decided in each case." Accordingly, we must examine the evidence to ascertain if such a charge was authorized and required.

The testimony disclosed that the defendant's mother had been married to the victim for about a year and had divorced the victim in 1972. During this marriage the victim allegedly assaulted defendant's

mother, the defendant, and defendant's brothers and sisters. These alleged assaults took place at least 10 years prior to the date of the victim's death as a result of the beating with a claw hammer administered at the hands of the defendant on March 20, 1982.

The defendant testified: "He [victim] used to beat my little brothers. He would beat my little sister and he would beat my mama all the time. Every time you turn around, she was beat up all over her face. And there was one time in particular that's always stood out in my mind. And when he got up to leave [on March 20, 1982], I was sitting in a position to where I was sitting right beside the door, so he'd have to pass me to leave. When he started walking towards me, all I could see was my mother's face where he'd beat her so bad you couldn't see nothing for the blood. I remember grabbing the hammer. That's my hammer right there; I remember grabbing it. The next thing I remember was seeing him laying on the floor." In response to the question by his counsel, "Now, Jimmy, did you *plan* to kill Randy Burns that evening?," defendant answered, "No, I did not." (Emphasis supplied.)

On cross-examination of the defendant the following transpired: "Q. And on March 20th, that particular day when this happened, he didn't do anything to you then either, did he? A. No, sir. Q. As a matter of fact, he was cordial and friendly to you correct? A. I guess so. Q. Isn't it true, Mr. Dollar, that on that particular day, you were the one that went up to him and tried to pick a fight or pick an argument because you confronted him with his drinking, correct? A. No, sir, I did not try to pick a fight or argument or anything. Q. Well, it did end in an argument, did it not? A. Not an argument, no, sir, I wouldn't call it that. Q. Well, another individual there at the scene asked y'all to cool it, that everybody was here to have a good time, is that correct? A. Yes, sir. Q. So there was some discussion, is that a correct statement? A. Yes, sir. Q. That became somewhat heated, is that a fair statement? A. I guess that would be a matter of opinion. There was never any harsh words or any voice raised, except what he said about my family. Q. Well, to the point that y'all had to shake hands, correct? A. We did shake hands, yes sir. Q. Now, you confronted him, I believe, because you were disappointed that he had been drinking, is that right? A. I guess so. Q. Well, you had been drinking, too, though, hadn't you? A. Yes, sir . . . Q. Okay, now, this fight, or this disagreement, excuse me, that you had with Mr. Burns earlier that evening, can you give me an idea about what time that occurred, just your best guess? A. I really don't know, I couldn't guess. Q. Let me ask you this, about how long before the assault was it, an hour, two hours? A. I would guess it was probably just a couple of hours. Q. A couple of hours. And during this period of time, everybody

was sitting around enjoying the music, right? A. Yes, sir. Q. Mr. Burns was there, you were there, these other folks were there playing music and enjoying themselves? A. Yes, sir. Q. Everybody had had a little something to drink, correct? A. Yes, sir. Q. And after this disagreement that you had with Mr. Burns, or this discussion, and y'all shook hands, he didn't say anything else to you, did he? A. Maybe just casual conversation. Q. Of a friendly nature? A. Yes, sir. Q. But all this time I suppose you were thinking about your past childhood and everything, right? A. Well, sir, it's hard to control what pictures pop into your mind sometimes . . . Q. You were feeling pretty good, weren't you? A. The liquor might have hit me just a little bit, if any at all. Q. And you remember everything that transpired up to that time, until you picked up the hammer, correct? A. Yes, sir, I think so. Q. Where was the hammer at, now? A. I don't remember, in the tool shed. Q. Are you sure you didn't go to that tool box and pick that hammer up? A. I don't remember. I remember grabbing the hammer, but I don't remember where I grabbed it from. Q. When did you grab the hammer? A. When he was walking towards me to go out the door. Q. You aren't saying he was walking towards you to do anything to you, are you? A. No, sir . . . Q. Well, when did you decide to pick the hammer up and hit him in the head? A. Like I said, when he was walking, when he was getting ready to go. All I could see when he was walking towards me, when he was right in front of me, all I could see was my mother's face. Q. That's all you could see? A. I grabbed my hammer. Q. And what did you do? A. I guess I attacked him. Q. He didn't have a chance, did he? A. I don't guess so. Q. Sir? A. I don't guess so . . . Q. You meant to hurt him, didn't you? A. I don't think so. Q. You don't think so? You don't think taking this heavy hammer and hitting somebody in the side of the head three or four times and you didn't mean to hurt him? A. The only thing that was going through my mind was the picture of my mother."

The state's evidence showed that the defendant administered several blows to the head of the victim with a claw hammer. These blows caused multiple lacerations and contusions about the head and ears of the victim with one laceration being "all the way through the jaw."

The transcript reflects that the trial court, in response to defense counsel's objection to the court's failure to charge on involuntary manslaughter, stated that "under the facts of this case . . . involuntary manslaughter dealing with a lawful act is not in any way involved in this case . . . that any unlawful act in this case on the part of the defendant would amount to a felony, and would not be a jury question as to whether it were a misdemeanor, as suggested by your charge."

In view of the totality of the evidence of the victim's injuries, the instrument (claw hammer) utilized in inflicting these serious injuries, had the victim survived and the jury rejected defendant's defense of insanity at the time of the crime, as the jury did in the case sub judice, the defendant would have been guilty not merely of simple battery but of aggravated assault, a felony.

The trial court did not err in declining to give a requested charge on involuntary manslaughter as the evidence did not warrant such a charge. See *White v. State,* 242 Ga. 21, 22 (7) (247 SE2d 759); *Cherry v. State,* 242 Ga. 644 (250 SE2d 490); *Booker v. State,* 242 Ga. 773, 777 (6) (251 SE2d 518). See also *State v. Stonaker,* 236 Ga. 1, 2 [Rule (3)] (222 SE2d 354).

*Judgment affirmed. Deen, P. J., Banke, Carley and Pope, JJ., concur. Shulman, C. J., Quillian, P. J., Birdsong and Sognier, JJ., dissent.*

DECIDED OCTOBER 5, 1983 —
REHEARING DENIED NOVEMBER 3, 1983 —

*Harry J. Fox, Jr.,* for appellant.
*G. Theron Finlayson, District attorney,* for appellee.

BIRDSONG, Judge, dissenting.
There is no more fundamental principle governing trial and appellate practice than that preventing either the trial judges or appellate courts from weighing the evidence on issues of fact raised by the evidence in criminal cases. Thus, as the majority opinion recognizes, "where there is *slight* evidence warranting the charge" (emphasis supplied) (*Arnett v. State,* 245 Ga. 470, 473 (265 SE2d 771)), "[i]t is error not to charge on involuntary manslaughter, upon request. . . ." Id. There are no exceptions to this rule; whenever "from the evidence . . . *some doubt, although slight,* might arise as to the intention to kill, the court should give in charge the law of involuntary manslaughter" (emphasis supplied) (*Warnack v. State,* 3 Ga. App. 590 (2) (60 SE 288)), and failure to do so mandates reversal. *Arnett,* supra, p. 474. Since the evidence in this case clearly and undisputedly raises some doubt as to Dollar's intent to kill, I cannot sanction the implicit decision of the majority in Division 3 and the trial court to weigh the evidence on the issue of Dollar's intent and determine that an involuntary manslaughter charge is not demanded by the evidence.

A brief review of the pertinent facts is illustrative. The undisputed evidence showed that Burns' death was caused by a cerebral concussion sustained as a result of approximately four blows

to his head administered by Dollar with a common, claw hammer. No fractures were revealed by autopsy. An eyewitness to the event testified without contradiction or impeachment that the lethal blows were "done so quick I couldn't count it because he wasn't, he didn't draw back real long enough for me to count it. . . . It was short licks, you know." Also undisputed, as can be seen from Dollar's testimony quoted by the majority, is the fact that the attack was sudden and unplanned. As can further be seen from Dollar's unequivocal testimony, he had no intention to kill Burns; he testified that he was not even certain that he intended to harm Burns.

Thus, this court is faced with the following facts which I believe require reversal of the trial court's refusal to charge on involuntary manslaughter: (1) the weapon used was not a per se deadly weapon; (2) the nature of the injury (absence of fractures) and manner in which the deadly instrumentality was used (a few "short licks" to the head) do not negate the absence of intent to kill; (3) the defendant's unequivocal testimony, if believed by the jury, does negate any intent to kill. Consequently, the evidence is more than sufficient to support defendant's contention that he caused Burns' death by committing an unlawful act other than a felony (simple battery, OCGA § 16-5-23 (Code Ann. § 26-1304)) without any intent to kill. OCGA § 16-5-3 (a) (Code Ann. § 26-1103). The charge on involuntary manslaughter, which was timely requested in writing by appellant, should have been given by the trial court.

It is interesting to note that the majority cites no case even remotely similar to the present case on its facts: *State v. Stonaker,* 236 Ga. 1, 2 (222 SE2d 354), a child molestation case (see *Stonaker v. State,* 134 Ga. App. 123 (213 SE2d 506)), merely sets forth the general rules regarding instructions on lesser included offenses; *Cherry v. State,* 242 Ga. 644 (250 SE2d 490), and *Booker v. State,* 242 Ga. 773, 777 (6) (251 SE2d 518), involved homicides committed by the use of a firearm (thus, the unlawful acts were felonies, see *Crawford v. State,* 245 Ga. 89, 92 (263 SE2d 131)); *White v. State,* 242 Ga. 21 (247 SE2d 759), contains no outline of the facts. In contrast to the absence of precedent for the state's position on this issue in this case, our reports are filled with numerous decisions reversing convictions because of refusals by trial courts to instruct juries on involuntary manslaughter in cases involving fact patterns closely analogous to the present case. A brief review of several of these decisions will illustrate the significant break from established precedent represented by the majority opinion.

In the early case of *Warnack v. State,* supra, this court held that it was error not to charge on involuntary manslaughter when the defendant had committed the homicide by fracturing the victim's

skull with a blow from a ten-pound brake stick measuring seven feet in length. *Jenkins v. State,* 86 Ga. App. 800 (72 SE2d 541), involved a homicide accomplished by striking the victim on the head with a large board "with which one could kill another by hitting him on the head." Id., p. 802. The court held that "where *from any circumstance* there is doubt of the accused's intention to kill, the trial court must not exclude the question of such intent from the consideration of the jury by a failure to charge the lesser offenses included in the charge of murder where, from the evidence and the reasonable inferences to be drawn therefrom, the jury would be authorized to find that no intention to kill existed. [Cit.]" (Emphasis supplied.) Id., p. 805. See also *Dorsey v. State,* 126 Ga. 633, 634 (55 SE 479); *Taylor v. State,* 108 Ga. 384 (3) (34 SE 2).

Likewise, this court held in *Hagin v. State,* 86 Ga. App. 92, 95 (70 SE2d 795), that the "fact that a knife was used by the defendant does not show, as a matter of law, that the defendant intended to kill the deceased." See also *Jackson v. State,* 234 Ga. 549 (216 SE2d 834) and *Jackson v. State,* 143 Ga. App. 734 (240 SE2d 180). While the use of a knife under certain facts may negate any question as to the intent to kill (see e.g., *Fitzhugh v. State,* 166 Ga. App. 320 (304 SE2d 127)), " 'where there is the *slightest doubt* as to whether any phase of manslaughter, either voluntary or involuntary is involved, the court should submit these principles of law to the jury.' *Ridley v. State,* 81 Ga. App. 737 (3) (60 SE2d 249)." (Emphasis supplied.) *Hagin,* supra, pp. 94-95.

In *Ridley v. State,* supra, this court held that it was error for the trial court to refuse to charge on involuntary manslaughter when the evidence showed "that the deceased came to his death by a blow with the fist or hand on the head, which knocked him to the ground, and while on the ground he was kicked two or three times with a shod foot . . ." Id., p. 738. See also *Wager v. State,* 74 Ga. App. 729 (41 SE2d 342). "It must be kept in mind that the evidence does not reveal that the weapon used was a weapon deadly per se, in the manner ordinarily used to kill. But there are weapons too numerous to name not deadly per se, but which may produce death, or which are likely to produce death when used in such a manner as could or does produce death. The latter class of weapons when used in such a manner which could or does produce death, raises no presumption of an intention to take human life. . . . In the use of a weapon not deadly per se, and . . . the killing is intentional, it is voluntary manslaughter; if unintentional, it is one of two phases of involuntary manslaughter." *Ridley,* supra, pp. 738-739.

In a statement remarkably analogous to one view of the evidence in this case, the Supreme Court held that when "there is evidence

from which the jury can find that the homicide resulted from a blow inflicted by the accused with an instrument which would not ordinarily produce death, and with which the accused, having hastily seized and picked up the same, without sufficient provocation, struck and killed the deceased, it is error requiring the granting of a new trial for the judge to fail to charge the law relating to the subject of involuntary manslaughter in the commission of an unlawful act." *Joiner v. State,* 129 Ga. 295 (1) (58 SE 859).

Also instructive on this issue with respect to the present cause are *Farmer v. State,* 112 Ga. 80, 81 (37 SE 120) (involuntary manslaughter charge required when homicide accomplished with " 'a thick, dark-colored beer bottle' "); *Benford v. State,* 158 Ga. App. 43 (279 SE2d 236) (involuntary manslaughter charge required when homicide accomplished by accidental discharge of gun used to strike victim). Compare the following cases, wherein involuntary manslaughter charges were not warranted: *Carter v. State,* 171 Ga. 406 (1) (155 SE 670) (defendant stabbed the victim thirteen times with an ice pick); *Fitzhugh v. State,* supra; *May v. State,* 146 Ga. App. 416, 417 (2) (246 SE2d 432) ("victim was beaten and then strangled with a ligature"); *Harris v. State,* 75 Ga. App. 199 (2) (43 SE2d 110) (defendant from behind sliced victim's neck with knife); *Wright v. State,* 199 Ga. 576 (34 SE2d 879) (defendant struck two month old baby with an axe). In all of the above cases and numerous cases not cited, the nature of the injury and the manner in which the instrumentality was used left no question as to the defendant's intent. However, the facts of the present case simply will not permit such a conclusion without weighing the evidence.

In view of the nature of the instrument used to inflict death (hammer), the manner in which the attack was perpetrated (a few "short licks"), the nature of the injuries (four contusions or lacerations with no fractures), and the testimony of the defendant as to intent, the jury clearly could have found that the defendant was guilty of involuntary manslaughter, and it was reversible error for the trial court to refuse to so charge.

Therefore, while I concur in Divisions 1 and 2, I must respectfully dissent from what I perceive to be a questionable departure from established precedent contained in Division 3 of the majority opinion.

I am authorized to state that Chief Judge Shulman, Presiding Judge Quillian and Judge Sognier join in this dissent.